## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **MAISOON MOHAMMED**, *et. al.*, | ) | |
| **Petitioners,** | ) | **C/A NO. 1:06 CV 01455 (RCL)** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **FRANCIS J. HARVEY**, *et. al.*, | ) | |
| **Respondents.** | ) | |
| | ) | |

## *MEMORANDUM OF LAW IN SUPPORT OF PETITIONERS' MOTION FOR A TEMPORARY RESTRAINING ORDER PREVENTING PETITIONER MOHAMMED MUNAF'S TRANSFER TO IRAQI AUTHORITIES*

Pursuant to Federal Rule of Civil Procedure 65(b), Petitioner Mohammad Munaf ("Mr. Munaf") and Petitioner's sister Maisoon Mohammed ("Ms. Mohammed") as next friend, hereby move for a temporary restraining order ("TRO") to prevent the United States government from transferring Mr. Munaf, a United States citizen, to Iraqi authorities. This request for relief will preserve the *status quo* and the jurisdiction of this Court to determine the lawfulness of the U.S. government's detention of Mr. Munaf. This request for relief is particularly urgent because Mr. Munaf faces a heightened and well-documented risk of torture, imprisonment without due process, and possibly even death if he were transferred to Iraqi custody.

Mr. Munaf's request is amply supported by Judge Ricardo M. Urbina's recent order barring the transfer of Shawki Omar upon identical material facts and legal issues. *See Omar v. Harvey*, No. 05-2374 (February 13, 2006) ("*Omar*"), attached as Exhibit A. The Court of Appeals for the District of Columbia Circuit will hear argument on the government's appeal of that decision on September 11, 2006. That appeal has been expedited at Mr. Omar's request. Petitioners here request that the Court bar Mr. Munaf's transfer until the appellate court issues a

decision in *Omar* so that this Court may duly consider its impact on the present litigation. Undersigned counsel also represent Mr. Omar in the district court and represent him on appeal.

Mr. Munaf seeks this TRO on an expedited briefing schedule because the government has advised undersigned counsel that Mr. Munaf will be tried for an unspecified crime before an Iraqi court on September 10, 2006. *See Declaration of Jonathan Hafetz* ¶ 5, attached as Exhibit B. If convicted, Mr. Munaf will be transferred to Iraqi custody after an administrative transfer period. *Id.* According to the government, this administrative transfer period is typically two to three weeks. *Id.* The government did not exclude the possibility that the administrative transfer period could be shorter. *Id.* The government also did not state or estimate how long the criminal proceeding would last. *Id.* On the basis of this information, Mr. Munaf seeks a TRO protecting the *status quo* and preventing possible irreparable harm, and an order requiring that the government's opposition to this motion be filed on or before September 15, 2006, and the Petitioners' reply brief be filed on or before September 20, 2006.

Pursuant to Local Rule of Civil Procedure 7(m), undersigned counsel conferred with counsel for the government before filing this motion. Counsel for the government stated that it will oppose the motion.

## STATEMENT OF FACTS

*i. Detention of Mr. Munaf.* As set forth in Mr. Munaf's Petition for Writ of Habeas Corpus ("Petition"), the U.S. government has complete and unfettered control over Mr. Munaf. Since detaining him in late May 2005, the U.S. military has held Mr. Munaf without charge, even though he is apparently not classified as a security threat. Petition ¶¶ 21-22. To date, Mr. Munaf and his counsel have not been told why he was taken into U.S. custody or why he has been imprisoned for more than fifteen months without lawful process. *Id.* ¶ 22.

Mr. Munaf is a 53-year-old American-Iraqi citizen. *Id.* ¶¶ 17. He was born in Baghdad and emigrated to the U.S. in 1990. *Id.* He became a U.S. citizen in 2000. *Id.* Mr. Munaf and his Romanian-born wife have three children, all of whom are U.S. citizens who currently reside in Bucharest, Romania. *Id.* ¶ 18.

In March 2005, three Romanian journalists invited Mr. Munaf to travel to Iraq with them as a guide and translator. *Id.* ¶ 19. They arrived in Baghdad on or around March 15, 2005. *Id.* On or about March 28, 2005, unknown armed forces kidnapped them. *Id.* An Iraqi group identifying itself as the "Muadh Ibn Jabal Brigade" publicly claimed responsibility for the kidnapping. *Id.* ¶ 20. The group demanded that Romania withdraw its troops from Iraq and sought millions of dollars in ransom. *Id.* On or about May 22, 2005, after approximately fifty-five days of captivity, Mr. Munaf and the Romanian journalists were released. *Id.* Upon their release, the journalists and Mr. Munaf were taken to the Romanian Embassy in Iraq. *Id.* ¶ 21. Mr. Munaf was transferred to U.S. custody that same day, immediately after the embassy visit. *Id.* ¶ 21. Mr. Munaf has remained in U.S. custody since that date.

Mr. Munaf is innocent. *Id.* ¶¶ 22, 28. He has committed no crime or violent act against the U.S. or its allies, nor has he supported forces hostile to American interests. He has never been a member of or associated with al Qaeda or any other terrorist organization. He has never been a member of or associated with any insurgent group or militia. The U.S. has told Ms. Mohammed that it does not have any evidence that Mr. Munaf violated any laws. *Id.* ¶ 22. Nevertheless the military is holding him in a prison located at the Baghdad International Airport. *Id.* ¶ 1. Though he has done no wrong, Mr. Munaf has been held unlawfully by his government in an Iraqi prison for more than a year.

### *ii. Judge Urbina's Preliminary Injunction Preventing The Transfer of Shawki Omar.*

Another court in this district recently faced the same question presented by this application. Shawki Omar is an American citizen held by American forces in Iraq. He too challenged his detention and threatened transfer to Iraqi custody in a habeas proceeding. On February 13, 2006 Judge Ricardo M. Urbina granted Mr. Omar's motion for a preliminary injunction preventing the U.S. government from transferring Mr. Omar to Iraqi custody. *See* Exhibit A. In support of the injunction preserving the *status quo* and maintaining jurisdiction Judge Urbina wrote:

> Because this controversy presents serious, substantial and difficult questions that give rise to the petitioner's right to present proof to support his claims, because the likelihood the petitioner will suffer irreparable injury is high, and because the public interest strongly favors vigorous application of the writ of habeas corpus on behalf of United States citizens, the court grants the petitioner's motion for a preliminary injunction.

*Id.* at 1. Oral argument on the U.S. government's appeal of Judge Urbina's order will be heard September 11, 2006. *See Omar v. Harvey*, No. 06-5126 (D.C. Cir.). This appeal has been expedited for prompt resolution by the D.C. Circuit.

The material facts and legal issues of *Munaf* and *Omar* are identical. Mr. Omar is an American citizen detained by U.S. authorities in Iraq. *Id*. at 2. When Mr. Omar's counsel learned from the U.S. government that his case would be referred to the Central Criminal Court of Iraq without notice to the district court or to counsel, they filed an *ex parte* application for a TRO on February 2, 2006. *Id*. The TRO sought to enjoin Mr. Omar's transfer to Iraqi custody to preserve the *status quo* pending resolution of his habeas petition and to forestall his likely torture. *Id*. Judge Urbina granted the temporary restraining order and directed the parties to file supplemental briefs addressing the factors for injunctive relief and the constitutional implications of judicial authority over the matter. *Id*.

After full briefing, Judge Urbina granted a preliminary injunction to preserve the court's jurisdiction pending resolution of the habeas petition and to prevent irreparable harm to Mr. Omar.  Judge Urbina determined that Mr. Omar's habeas petition would likely succeed on the merits given that well-settled Separation of Powers principles grant federal courts the jurisdiction to review the detention of U.S. citizens held by U.S. authorities.  *Id.* at 5-13.  He also determined that Mr. Omar would suffer irreparable harm if transferred to Iraqi custody.  *Id.* at 13-14.  At a minimum, he concluded, that harm included the risk of torture, the premature mooting of the case, and the possible elimination of the court's jurisdiction.  *Id.*  This would "abuse the process now put in place for the purpose of adjudicating matters on their merits."  *Id.*    Judge Urbina further found that the threat of tangible harm to Mr. Omar by the court's failure to act outweighed any potential harm to the Executive.  *Id.* at 15.  Finally, he determined that the public had an interest in a judiciary that "does not shirk its obligations."  *Id.*  For these weighty reasons, Judge Urbina enjoined the transfer of Mr. Omar to Iraqi authorities and preserved the *status quo*.

***iii.  Iraqi Authorities' Systematic Use of Torture.***  Absent Court intervention, Mr. Munaf could be handed over to the Iraqis for possible torture.  The record before Judge Urbina included declarations from seasoned researchers with Amnesty International, USA, and Human Rights Watch, which attested to ongoing torture by Iraqi authorities.  The first declaration was from Curt Goering, Deputy Executive Director of Amnesty International, USA, who traveled to Iraq to investigate allegations of torture and abuse and interview survivors of torture.  *See Declaration of Curt Goering*, attached as Exhibit B.  He and other Amnesty researchers confirmed that Iraqi government forces regularly and systematically engage in torture.  *Id.* ¶¶ 3-4.  Iraqi torturers are known to use electric shocks, cigarettes and electric drills on different parts of the victim's body;

to strangle and suffocate the victim; to break the victim's limbs; and to sexually abuse the victim. *Id.*

Mr. Goering further attested that Iraqi government forces have not established a functioning judicial system and that the United Nations mission in Iraq recently called for the release of hundreds of prisoners, who remained confined despite court orders for their release. *Id.* ¶ 5. As Mr. Goering stated, Iraqi criminal procedures fall far short of international standards for fair trials. *Id.* ¶ 7. Court proceedings for those charged with "terrorist activities" include the use of evidence secured by torture or abuse. *Id.* ¶ 6. Mr. Goering concluded:

> Based on Amnesty International's extensive research and investigations, we conclude that Shawki Omar would be at grave and serious risk of being tortured if he were turned over to the Iraqi criminal authorities. Based on Amnesty International's extensive research and investigation, we conclude that Shawki Munaf is not likely to receive a trial in conformity with international standards for fair trials if he were to be tried by the Iraqi criminal authorities.

*Id.* ¶¶ 8-9.

Judge Urbina also had before him the declaration of Hania Mufti, the Iraq expert with Human Rights Watch, who reports that the systemic and widespread torture documented in the Human Rights Watch 2006 World Report remain ongoing. *See Declaration of Hania Mufti*, attached as Exhibit C, at ¶ 2. The Report found:

> The torture and ill-treatment of detainees in Iraqi custody remains a serious concern, with the level of reported incidents rising. The vast majority of allegations concern forces of the Iraqi Ministry of Interior, as well as members of the Iraqi armed forces under Ministry of Defense authority. *Detainees in pre-trial detention on security-related offenses, in particular, are subjected to various forms of torture or ill-treatment, including routine beatings, sleep deprivation, electric shocks to sensitive parts of the body, prolonged suspension from the wrists with the hands tied behind the back, deprivation of food and water for prolonged periods, and severely overcrowded cells.* Former detainees held by Ministry of Interior forces in connection with alleged terrorist offenses linked

> to insurgent activity report other forms of torture, including having
> weights attacked to their testicles, or having a string tied tightly
> round their penis and then being forced to drink large amounts of
> water.

Human Rights Watch, *World Report 2006*, at 50 (2006), attached as Exhibit D.[1]

Since Judge Urbina issued a preliminary injunction in February, the torture and murder of

detainees in Iraqi custody has grown substantially more widespread.  Treatment of Sunnis like

Mr. Munaf has been especially brutal.  *See, e.g.* Louise Roug, *U.S. Official Discusses Law in*

*Lawless Capital*, THE LOS ANGELES TIMES, Aug. 30, 2006, at A8 ("torture and extra-judicial

killings by militias and Shiite-dominated security forces have become a widespread problem";

recently discovered victims of execution in Baghdad had been tortured); Amnesty International,

*Iraq: Amnesty International greatly concerned by rising toll of civilian killings, including for*

*discriminatory        motives*,       August        10,        2006,        available        at

http://web.amnesty.org/library/Index/ENGMDE140302006?open&of=ENG-IRQ  ("[S]cores  of

people, mostly young or adult men, have been abducted and murdered; often, their hands had

been tied and they appear to have been tortured.  Sectarian motivations are suspected in many of

these killings.").  Moreover, new judges in the judiciary system instituted by the Coalition

Provisional Authority in post-war Iraq "'face pressure from Iraq's powerful tribal structure and

other interested parties to perpetuate a court system based on favoritism.' Such pressure often

comes in the form of threats to the judges' lives." Ryan J. Liebl, *Rule Of Law In Postwar Iraq:*

*From Saddam Hussein To The American Soldiers Involved In The Abu Ghraib Prison Scandal*,

*What Law Governs Whose Actions?*, 28 HAMLINE L. REV. 91, 103 (2005).  Evidence strongly

suggests that the Iraqi administration -- particularly the Interior Ministry under the leadership of

Bayan Jabr, a former prominent member of an Iranian-backed, fundamentalist group -- has

---

[1] This Human Rights Watch report was also before Judge Urbina.

endorsed sectarian violence. *See* Ken Silverstein; *The Minister of Civil War*, HARPER'S MAGAZINE, August 2006, at 67-73. ("In November [2005], American troops discovered more than 160 beaten, whipped and starved prisoners—again mostly Sunni—at a secret detention center run by the country's Interior Ministry. Since then, Shiite militias have become so integrated into the Iraqi government's security apparatus and their work so organized, systematic and targeted that they are commonly referred to in Iraq ... by their proper name: death squads."). Indeed, "Interior Ministry forces were widely believed to be ... running a network of detention and torture centers." *Id.*; *see also* Michael Moss, *How Iraq Police Reform Became Casualty of War,* N.Y. TIMES, May 22, 2006, at A1 ("the police began acting as militia of [sectarian] groups to carry out sectarian violence and enforce a fundamentalist creed"); Thomas R. Eddlem; *The Iraq our soldiers are dying for*, THE NEW AMERICAN, January 6, 2006, at 19 ("[P]rohibition against torture has been routinely ignored by the new Iraqi government. Interior minister Bayan Jabr has been running a network of secret torture prisons throughout the country."). Reports of torture and murder of Sunnis detained by Iraqi authorities are thus widespread and persistent.

The U.S. government's own reports further confirm that the Iraqi criminal authorities more than likely would torture Mr. Munaf. As far back as February 28, 2005, the United States Department of State reported "numerous, serious human rights abuses" and "[c]orruption at all levels of the Government," including "dysfunctional" aspects of the judicial system. United States Department of State, Country Reports on Human Rights Practices for 2004, Feb. 28, 2005, attached as Exhibit E. Reported torture includes instances of "beatings with cables and hosepipes; electric shocks to [prisoners'] earlobes and genitals; and food and water deprivation, and overcrowding in standing room only cells." *Id.* The State Department also reported that "coerced confessions and interrogation continued to be the favored method of investigation by

police." *Id.* Further problems in the criminal justice system uncovered by the U.S. government include "arbitrary arrest and detention practices," "lengthy pretrial detention," and ignoring court orders requiring proof of the lawfulness of an arrest. *Id.*[2]

## ARGUMENT

This Court should provide the same modest yet vital relief as Judge Urbina: an order preserving the *status quo* and preventing Mr. Munaf's threatened transfer to Iraqi custody in order to consider his claims on the merits.   The wisdom of this course is underscored by the fact that the D.C. Circuit is presently considering the same issue in the government's appeal of Judge Urbina's decision.  The Court should thus enter a TRO preventing Mr. Munaf's transfer and his irreparable harm.

## I.    THIS COURT SHOULD ENJOIN THE GOVERNMENT FROM DELIVERING A CITIZEN TO LIKELY TORTURE AND DENYING HIM HIS RIGHT TO JUDICIAL REVIEW.

### A.    Petitioners Have Carried The Burden Necessary For A TRO To Preserve The *Status Quo.*

Petitioners unquestionably meet the four elements necessary for the issuance of a preliminary injunction to preserve the *status quo.*  That is: (1) Petitioners are likely to succeed on the merits of their habeas claim; (2) Mr. Munaf will be irreparably injured if relief is withheld; (3) an order will not substantially harm anyone; and (4) order would further the public interest by ensuring that the United States does not willingly ignore the Constitution and the rule of law

---

[2] As a result of the risk of torture, several United States officials have stated that prisoners in U.S. custody would not be transferred into Iraqi hands.  United States envoy to Baghdad Zalmay Khalilzad stated earlier this year that "U.S. officials believe that . . . the Interior Ministry has condoned torture of Sunni prisoners and increasingly used the police to settle sectarian scores."  David Ignatius, *America's Message to Iraq*, WASH. POST, Jan. 25, 2006, at A19.  United States' officials reported they found the Iraqi authorities had engaged in the "breaking of bones, torture with electric shock, extraction of fingernails, and cigarette burns to the neck and back" in a Baghdad detention center.  Ellen Knickmeyer, *Abuse Cited In 2nd Jail Operated by Iraqi Ministry; Official Says 12 Prisoners Subjected to 'Severe Torture'*, WASH. POST, Dec. 12, 2005, at A1.  Indeed, as recently as December 25, 2005, Major General John D. Gardner of the Army stated that the military was not going to turn over prisoners to the Iraqis.  *See* Eric Schmitt and Thom Shanker, *U.S., Citing Abuse In Iraqi Prisons, Holds Detainees*, THE NEW YORK TIMES, Dec. 25, 2005. at A1.

to engage in or participate in torture. *See, e.g., CSX Transp., Inc. v. Williams*, 406 F.3d 667, 670 (D.C. Cir. 2005) (citations omitted) (setting forth standard for injunctive relief).[3]

Significantly, Mr. Munaf does not seek to change the *status quo*, but merely to preserve it. He asks only to prevent a unilateral act by one party to the litigation that doubtless will prejudice him directly by depriving the Court of the ability determine the lawfulness of his detention by the United States and his transfer to Iraqi custody. It is well-settled that this kind of conservative, stand-still relief demands a lesser showing than an effort to change the *status quo*. *See, e.g., Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977). As the Court of Appeals for the District of Columbia Circuit has held, where the balance of hardships tips decidedly toward the movant – as it clearly does here – it will "'ordinarily be enough that the [movant] has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation.'" *Id.* Just as in *Omar*, there is a fair ground for litigation here.

### 1.    Mr. Munaf Is Likely To Be Granted Habeas Relief.

Petitioners' underlying habeas petition is meritorious and likely to succeed. It is now well-established that individuals held by the United States cannot be imprisoned without legal process. *See Hamdi v. Rumsfeld*, 542 U.S. 507 (2004). The United States has held Mr. Munaf for fifteen months without charge, without a hearing, and without due process. It has ignored his repeated requests for access to American counsel and to the United States courts. Now, the U.S. government risks obviating federal judicial scrutiny through a precipitous transfer to Iraqi custody before this Court can address the merits of Mr. Munaf's petition.

---

[3] The standard on a motion for a preliminary injunction is the same as the standard on an application for a temporary restraining order. *See, e.g., Experience Works, Inc. v. Chao*, 267 F. Supp. 2d 93, 97 (D.D.C. 2003) (citing *Holiday Tours*, 559 F. 2d at 843)..

Mr. Munaf has the same, if not greater,[4] right to federal judicial process as Mr. Hamdi, whose right to habeas was vindicated by the Supreme Court. *Id.* There, the Court held that "process was due once it became clear that a determination had been made to continue holding the prisoner." *Id.* at 534 (plurality op.). In this case, it is clear beyond cavil that the U.S. government has made a determination to continue holding Mr. Munaf beyond his initial apprehension.

Mr. Munaf's challenge to his continued detention implicates "the fundamental nature of a citizen's right to be free from involuntary confinement by his own government without due process of law." *Id.* at 531. Like *Hamdi*, this case asks whether any meaningful constitutional and statutory safeguard exists against the government's indefinite detention of American citizens. Given the gravity of the rights and interests at stake, "there is substantial equity, and need for judicial protection, whether or not movant has shown a mathematical probability of success." *Holiday Tours, Inc.*, 559 F.2d at 844.

### 2.    Mr. Munaf Faces Irreparable Harm If He Is Transferred To Iraqi Custody Without Judicial Review.

Mr. Munaf's transfer to Iraqi custody would cause him irreparable harm for three reasons. *First*, Mr. Munaf's transfer to Iraqi custody would expose him to a substantial risk of torture, even death, at the hands of Iraqi authorities. It is beyond question that all citizens have a substantive due process right to be free from torture. *Chavez v. Martinez*, 538 U.S. 760, 773 (2003) (plurality op.); *Miller v. Fenton*, 474 U.S. 104, 109 (1985) (torture or other abusive interrogation techniques "are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause"); *Rochin v. California*, 342 U.S. 165, 172 (1952) (describing conduct that "shocks the conscience"); *Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28, 40 &

---

[4] Unlike Mr. Hamdi, Mr. Munaf was not seized or detained in a zone of active combat – he was taken from the Romanian embassy when he had been delivered after being kidnapped.

n.7 (D.D.C. 2004) (rejecting government position "arguing for nothing less than the unreviewable power to separate an American citizen from the most fundamental of his constitutional rights," including freedom from torture); *cf. Rosado v. Civiletti*, 621 F.2d 1179 1195-96 (2d Cir. 1980) (requiring close scrutiny in extradition proceeding where transfer "would expose [petitioner] to procedures or punishment 'antithetic to a federal court's sense of decency'").

Mr. Munaf's right to be free from torture is also protected by the 1984 Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"). Article 3 of CAT states: "No State Party shall expel, return ('refouler') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." This provision has been incorporated into United States law under the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA") of 1998, which provides that "[i]t shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, *regardless of whether the person is physically present in the United States*." Pub. L. No. 105-227, Div. G., Title XXII § 2242, 112 Stat. 2681, 2681-822, codified as note to 8 U.S.C. § 1231 (emphasis added); *see also* the Torture Victim Protection Act of 1991, Pub. L. 102-256, Mar. 12, 1992, 106 Stat. 73 (ensures that United States citizens are protected from torture). Federal courts have "jurisdiction under § 2241 to consider claims arising under CAT, as implemented by FARRA." *Wang v. Ashcroft*, 320 F.3d 130, 142 (2d Cir. 2003); s*ee also Ogbudimpka v. Ashcroft*, 342 F. 3d 207, 220 (3rd Cir. 2003) ("[T]hose individuals whose detention violates FARRA may challenge their detention under 28 U.S.C. § 2241.").

As described above, a Sunni like Mr. Munaf faces a serious risk of torture if the U.S. government turns him over to the Iraqi authorities. Indeed, there is even greater evidence of torture and abuse by Iraqi officials now than there was when Judge Urbina enjoined the government from handing over another U.S. citizen to Iraqi custody.

*Second*, transfer would threaten his right to seek review of his detention by habeas corpus. This serious threat undergirded Judge Urbina's decision in *Omar*. Judge Urbina determined that "[d]ivesting the court of jurisdiction, either as a matter of law or *de facto*, would abuse the process now put in place for the purpose of adjudicating matters on their merits." *Omar* at 14, attached as Exhibit A. Mr. Munaf's right to seek review of his detention is guaranteed under the federal habeas statute, 22 U.S.C. § 2241, the Suspension Clause, Art. I, § 9, cl. 2, and the Due Process Clause of the Fifth Amendment. Habeas review includes whether there is a lawful basis for United States officials to hold Mr. Munaf and to transfer him to Iraqi custody. Regardless of whether Mr. Munaf ultimately proves that his continued detention and/or transfer is unlawful, it is certain – as Judge Urbina found in *Omar* – that handing him over to Iraqis will jeopardize his right to review of those claims by this Court.

*Third*, Mr. Munaf's transfer to Iraqi custody would deprive him of his rights to due process under the Due Process Clause and Suspension Clause. These rights were reaffirmed in *Hamdi*, where the Supreme Court set clear constitutional limits on the government's ability to imprison citizens found on the battlefield. The Court concluded that such detention was proper only "for the duration of the conflict" and also that detainees must receive meaningful notice of the basis for their detention and "a fair opportunity to rebut the Government's factual assertions before a neutral decision maker." 542 U.S. at 533 (plurality op.); *id.* at 553 (Souter J., concurring in part, dissenting in part, and concurring in the judgment). As set forth more fully in

the Statement of Facts above, it is unlikely that Mr. Munaf would receive a trial in accord with international standards if he were to be turned over to the Iraqi criminal system, but would instead be subject to indefinite imprisonment without due process. Transfer would erode his opportunity to avail himself of his rights outlined in *Hamdi*.

### 3.    Maintaining The *Status Quo* Does Not Harm The Government.

In contrast to the risk of irreparable harm confronted by Mr. Munaf, the government will not be harmed at all by being prohibited from acting unlawfully by transferring a United States citizen to Iraq. The government has held Mr. Munaf for fifteen months. Recently, it has indicated its intention to transfer Mr. Munaf, and obviously suffers no harm if that transfer is delayed while its legality is tested. Whatever interest the government has in completing this transfer, it does not outweigh the rights Mr. Munaf enjoys under the Constitution and laws of the United States.

### 4.    Protecting An American Citizen's Right To Judicial Review And To Be Free From Torture Is In The Public Interest.

The public interest clearly benefits from ensuring that American citizens retain the opportunity to assert their rights under the Constitution and laws of the United States in federal court. The executive claims the right to transfer Mr. Munaf to Iraqi custody at any moment, without notice to court or counsel. Only an order from this Court will guarantee that this transfer does not deprive him of his right to review of the merits of his claims and his rights under the Constitution.

### B.    Further Proceedings Are Appropriate And Necessary Absent Agreement By The Government Not To Transfer Mr. Munaf In Violation of His Constitutional and Statutory Rights.

Unless the U.S. government is willing to agree not to transfer Mr. Munaf to the custody of the Iraqi authorities pending resolution of his habeas petition, this Court should enjoin the

- 14 -

government from going forward with the completed transfer.  Alternatively, the Court should allow discovery and schedule an evidentiary hearing at which Petitioners will demonstrate that such transfer would subject Mr. Munaf to likely torture.  *See, e.g.*, *Abu Ali*, 350 F. Supp. 2d at 68-69 (granting expeditious discovery to resolve factual disputes where American citizen detained overseas).  Indeed, it is "the inescapable obligation" of this Court to authorize appropriate discovery so that the necessary facts may be determined.  *See Harris v. Nelson*, 394 U.S. 286, 299 (1969).  The habeas writ must be "administered with the initiative and flexibility essential to insure that miscarriages of justice . . . are surfaced and corrected."  *Id.* at 291; *see also Townsend v. Sain*, 372 U.S. 293, 312 (1963) ("[T]he power of inquiry on federal habeas corpus is plenary."), *overruled on other grounds*, *Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992).

## II.    THE COURT SHOULD PRESERVE THE *STATUS QUO* BY ISSUING AN ORDER BARRING MR. MUNAF'S TRANSFER TO IRAQI CUSTODY PENDING DECISION BY THE DISTRICT OF COLUMBIA CIRCUIT IN THE *OMAR* CASE.

The District of Columbia Circuit is presently considering on an expedited schedule the government's appeal of Judge Urbina's preliminary injunction in *Omar*.  The parties' arguments raise significant legal questions under the precedents of the Supreme Court and this Circuit.  At a minimum, therefore, this Court should preserve the *status quo* pending appellate resolution of these issues, which are materially identical to those raised here.  *See e.g. Alabama Great S.R. Co. v. Thompson,* 200 U.S. 206, 218 (1906) ("[T]he federal courts may and *should* take such action as will defeat attempts to wrongfully deprive parties entitled to sue in the Federal courts for the protection of their rights in those tribunals.").

The All Writs Act  provides a district court with broad authority to protect its jurisdiction.  28 U.S.C. §1651; *Securities and Exchange Commission v. Vision Communications, Inc.*, 74 F.3d 287, 291 (D.C. Cir. 1996).  Given the significance of the issues at stake, the irreparable harm to

Mr. Munaf, and the absence of prejudice to the government, this Court should issue an order preserving the status quo and protecting its jurisdiction until the court of appeals can resolve the issues underlying the instant motion.

Simply put, prudence and congruence of judicial outcomes dictate that the *status quo* in the present case be maintained until the appeal in *Omar* is resolved. *See Holiday Tours, Inc*, 559 F.2d at 844; *Ahmad v. Bush*, 2005 WL 1606912 (D.D.C. July 8, 2005) ("A primary purpose of a stay pending resolution of the issues on appeal is to preserve the status quo among the parties."); *see also Adams v. Wainwright*, 734 F.2d 511 (11th Cir. 1984) (staying execution pending appeal of same issue in a concurrent case).

## CONCLUSION

For the foregoing reasons, Petitioners respectfully request that the Court grant a TRO preventing Mr. Munaf's transfer to Iraqi custody pending resolution of his habeas petition.

Respectfully submitted,

_____/s/ Jonathan Hafetz_____
Jonathan Hafetz (admitted *pro hac vice*)
Aziz Z. Huq (admitted *pro hac vice*)
BRENNAN CENTER FOR JUSTICE AT
NEW YORK UNIVERSITY LAW SCHOOL
161 Avenue of the Americas
12th Floor
New York, NY  10013
Telephone:    (212) 998-6730
Facsimile:    (212) 995-4550

Susan L. Burke (D.C. Bar # 414939)
BURKE PYLE LLC
4112 Station Street
Philadelphia, PA 19127
Telephone:    (215) 487-6596
Facsimile:    (215) 482-0874

Joseph Margulies
MACARTHUR JUSTICE CENTER,
NORTHWESTERN UNIVERSITY
SCHOOL OF LAW
357 East Chicago Avenue
Chicago, IL  60201
Telephone:    (312) 503-0890

*Counsel for Petitioners*

Dated: September 8, 2006