IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____
                                )
MAISOON MOHAMMED, et al.,       )
                                )
             Petitioners,       )
                                )
      v.                        )    Civil Action No. 06-1455 (RCL)
                                )
FRANCIS J. HARVEY, et al.,      )
                                )
             Respondents.       )
_____)
```

## RESPONDENTS' OPPOSITION TO PETITIONERS'
## MOTION FOR A TEMPORARY RESTRAINING ORDER

Respondents hereby oppose petitioners' remarkable request that this Court issue a

temporary restraining order preventing an international military force from fulfilling its duty

under United Nations mandates to transfer petitioner Mohammad Munaf ("Munaf"), a defendant

in the midst of prosecution under Iraq's criminal justice system, to the sovereign government of

Iraq in the event he is convicted and sentenced at trial in an Iraqi court.  The Court should deny

petitioners' motion because it fails to satisfy the requirements for temporary injunctive relief.

In particular, petitioners cannot demonstrate a likelihood of success on the merits of their

underlying habeas petition.  As an initial matter, petitioners' motion rests on the faulty premise

that this Court has habeas jurisdiction over Munaf's custodians.  See Memorandum of Law in

Support of Petitioners' Motion for a Temporary Restraining Order at 1-2 (dkt. no. 7) (Sept. 8,

2006) ("Petrs.' Mem.").  Munaf, however, has been and currently is in the custody of the

Multinational Force – Iraq ("MNF-I"), which is a coalition of forces from nations around the

world that, pursuant to United Nations Security Council resolutions and at the request of the

sovereign government of Iraq, is assisting that government's efforts to maintain security and

stability in Iraq.  Munaf is in MNF-I custody, under the international authority of the U.N. mandate, while his criminal prosecution proceeds through the Central Criminal Court of Iraq ("CCCI") – a national court of Iraq that operates under Iraqi law.  Because the Supreme Court long ago held that habeas jurisdiction does not lie with respect to detentions, even by U.S. military personnel, undertaken pursuant to international (or non-U.S.) authority, this Court lacks jurisdiction over this case.

Further, regardless of the authority under which Munaf is being detained, the relief sought by petitioners would require the Court to violate fundamental principles of separation of powers by interfering in the Executive's authority over the nation's foreign affairs and national security matters during a period of ongoing hostilities abroad and would force the Court to answer non-justiciable political questions.  Granting petitioners' motion would cause this Court to override the Executive's authority to direct the manner in which U.S. military forces participate in international coalitions and to intrude on the Executive's discretion to determine when individuals suspected of committing crimes in foreign countries may be transferred to foreign jurisdictions to face prosecution and punishment.  In addition, the order sought in this case would interfere with the government of Iraq's decision to procure the assistance of an international force in detaining criminal suspects.  Incredibly, it would also prohibit the government of Iraq from obtaining custody of a native Iraqi, currently detained in Iraq in the midst of his prosecution, who will be tried and possibly convicted by an Iraqi court for crimes committed in Iraq.

The decision in <u>Omar v. Harvey</u>, 416 F. Supp. 2d 19 (D.D.C. 2006), moreover, does not compel this Court to grant the relief requested.  Notwithstanding that the decision in <u>Omar</u> is not

binding on this Court, unlike the petitioner in Omar, whose prosecution in the CCCI had not

commenced when he sought and obtained injunctive relief, Munaf's prosecution has been

underway for months; Munaf has appeared before an Iraqi Investigative Hearing Judge as part of

the CCCI criminal process, who has determined that there is sufficient evidence against Munaf

to proceed to trial, and he soon will be tried before a CCCI Trial Panel.  Accordingly, the district

court's decision in Omar is not sufficient to establish that petitioners are likely to succeed.

Nor can Munaf adequately demonstrate that he will be irreparably harmed unless the

TRO is granted.  Because Munaf has been in the custody of the MNF-I pursuant to international

authority since his arrest in Iraq, he has never been subject to this Court's habeas jurisdiction.

As a result, he cannot claim to be at risk of losing an opportunity for legal redress that he never

had to begin with.  Furthermore, Munaf's alleged fear of torture is based on the inaccurate

assumption that he would be transferred to an Iraqi prison where detainees are alleged to have

been abused.  For all of these reasons, petitioners' motion for a temporary restraining order

should be denied.

## BACKGROUND

**A.    The Multinational Force – Iraq and the Sovereign Government of Iraq**

MNF-I is a coalition authority consisting of forces from approximately twenty-seven

different nations, including the United States.[1]  Declaration of Major General John D. Gardner

("Gardner Decl.") ¶ 2 (attached as Exhibit 1).  While the United States is a leading participant in

---

[1]  In addition to forces from the United States, military forces from the following
countries are participants in the MNF-I: Albania, Armenia, Australia, Azerbaijan, Bosnia and
Herzegovina, Bulgaria, Czech Republic, Denmark, El Salvador, Estonia, Georgia, Italy, Japan,
Kazakhstan, South Korea, Latvia, Lithuania, Macedonia, Mongolia, Netherlands, Norway,
Poland, Romania, Slovakia, United Kingdom, and Ukraine.

MNF-I, MNF-I is legally distinct from the United States, and obtains its authority to act from United Nations Security Council Resolutions at the request of the sovereign government of Iraq. Id.  In particular, U.N. Resolution 1546 provides, in part, that "the multinational force shall have the authority to take all necessary measures to contribute to the maintenance of security and stability in Iraq in accordance with the letters annexed to this resolution expressing, inter alia, the *Iraqi request* for the continued presence of the multinational force and setting out its tasks, including by preventing and deterring terrorism . . . ."  U.N. Resolution 1546 ¶ 10 (June 8, 2004) (attached as Exhibit 2) (emphasis added).  Included among the MNF-I tasks identified in the letters annexed to Resolution 1546 are combat operations against members of groups posing security threats to Iraq and internment of such members where necessary.  See June 5, 2004 Letter from U.S. Secretary of State Colin Powell to President of the Security Council Lauro Baja, Jr. attached to U.N. Resolution 1546.  On November 11, 2005, U.N. Resolution 1546 was extended and reaffirmed by a subsequent resolution of the United Nations.  See U.N. Resolution 1637 ¶ 1 (November 11, 2005) (attached as Exhibit 3) (noting that "the presence of the multinational force in Iraq is at the request of the Government of Iraq and, having regard to the letters annexed to this resolution, *reaffirms* the authorization for the multinational force as set forth in resolution 1546 (2004) and *decides* to extend the mandate of the multinational force as set forth in that resolution until 31 December 2006") (emphasis in original).

Under the authority of these U.N. Security Council Resolutions, the government of Iraq and MNF-I further agreed that MNF-I would maintain physical custody of pre-trial detainees awaiting criminal prosecution in Iraqi courts under Iraqi law, in light of the fact that many Iraqi prison facilities had been damaged or destroyed during the Iraq war.

**B.    The Circumstances Leading to the Capture and Detention of Munaf**

Munaf, an individual apparently with Iraqi, Romanian, and American citizenship, was born in Baghdad, Iraq, and married a Romanian woman in 1989. See Petition for Writ of Habeas Corpus (dkt. no. 1) (Aug. 18, 2006) ("Petition") ¶¶ 17-18. He and his wife emigrated to the United States in 1990, and Munaf became a U.S. citizen in 2000. Id. Since 2001, Munaf and his family have resided in Romania. Id. ¶ 18.

Munaf was captured by MNF-I forces in Iraq on May 23, 2005 during a targeted raid to rescue three Romanian journalists who had been kidnapped previously on March 28, 2005. Gardner Decl. ¶¶ 4, 14. Since his capture, Munaf has admitted in front of an Iraqi Judge that he participated as an accomplice in the kidnapping of the three Romanian journalists on March 28, 2005. Id. ¶ 11. Munaf was assisted in the kidnapping by three other individuals: Ibrahim Al Giuburi (Munaf's brother-in-law) ("Al Giuburi"), Omar Hayssam (the alleged mastermind of the kidnapping plan) ("Hayssam"), and Omar Mahmmod (Hayssam's brother). Id.

According to Munaf's own statements, he first met with Hayssam in January 2005 to discuss the kidnapping plans. Id. ¶ 12. Hayssam wanted to conduct a kidnapping of Romanians so that he could then negotiate their release and become a national hero in Romania in order to gain the support of Romanian President Traian Basescu to develop new business in Romania. Id. Hayssam's initial plan was to kidnap Romanian Senator Vasile Ion, with whom Hayssam had a close relationship. Id. Munaf allegedly refused to participate in that plan, so Hayssam developed another plan to kidnap the Senator's daughter, Marie Jeanne Ion, who is a Romanian journalist, as well as two other Romanian journalists. Id. ¶¶ 12-13. Under this plan, Munaf would travel with the three Romanian journalists to Iraq and act as their guide and translator and

then help facilitate their kidnapping.  Id. ¶ 13.  The plan called for Munaf to act as if he were a kidnap victim too.  Id.

Munaf stated that he was contacted again by Hayssam on March 21, 2005, who asked him to execute their kidnapping plan.  Id. ¶ 14.  Munaf claims that he initially resisted but eventually agreed to participate after Hayssam pressured him to take part.  Id.  Munaf met with his brother-in-law, Al Giuburi, in Iraq a few days before the kidnapping and received more details about the plan.  Id.  The kidnapping was to occur on March 28, 2005, at an arranged location about 70 kilometers outside of Baghdad.  Id.

On the morning of March 28, Munaf met with Al Giuburi and a man identified as Hagji, who was the contracted kidnapper.  Id.  Hagji wanted $30,000 to conduct the kidnapping, with half of it paid before the kidnapping and the other half after the kidnapping was completed.  Id.  Munaf had only $14,000 with him, so he called Hayssam to send him the rest of the money.  Id.  Hayssam said that his brother would send the rest of the money the next day.  Id.  The kidnapping went forward and was completed later on March 28 at the appointed location.  Id.  The contracted kidnappers blocked passage of the journalists' car and took Munaf, Marie Jeanne Ion, and the two other Romanian journalists hostage as planned.  Id.  After nearly two months in captivity, MNF-I forces rescued the three Romanian journalists on May 23, 2005 and took Munaf into custody for his suspected involvement in the kidnapping plot.  Id. ¶ 4.[2]

---

[2]  It has been reported that Munaf has been indicted in Romania for his role in the kidnapping of the journalists.  See Businessmen Were Behind Kidnapping of Romanian Journalists, Agence France Press, Oct. 17, 2005 (attached as Exhibit 4).

C.        **The MNF-I Tribunal and the Central Criminal Court of Iraq**

Following Munaf's capture, on July 18, 2005 he appeared before a three-member panel

of MNF-I officers who convened a proceeding to conduct a comprehensive review of Munaf's

status and detention.  Gardner Decl. ¶ 5.  The panel reviewed the facts and circumstances

surrounding Munaf's capture, interviewed witnesses, and considered available intelligence

information.  Id.  Munaf was present at the hearing and had the opportunity to hear the basis for

his detention, to make a statement, and to call witnesses who were immediately available.  Id.

The panel determined that Munaf was considered a security internee and should be further

interned in accordance with MNF-I's mandate under the U.N. resolutions.  Id.

Subsequently, Munaf's case was referred to the Government of Iraq, which decided to

institute criminal proceedings against Munaf in the Central Criminal Court of Iraq ("CCCI").  Id.

¶ 6.  U.S. authorities indicated that they had no objection to Iraq's plans to prosecute Munaf in

the CCCI for his alleged crimes committed in Iraq.  Id.

The CCCI is an independent national court of the sovereign government of Iraq that

operates under Iraqi law.  Id. ¶ 7.  The CCCI is based in the city of Baghdad, is comprised of

Iraqi judges who have attended the Iraqi Judicial School, and is administered by the Iraqi Higher

Juridical Counsel.  Id.  The CCCI consists of two chambers: an investigative court and a trial

court.  Id. ¶ 8.  In the investigative court a judge presides over an Investigative Hearing to

determine if there is a sufficient basis to refer the accused for trial.  Id.  Witnesses provide sworn

testimony, and the Investigative Judge questions the witnesses to clarify their testimony.  The

accused is entitled to counsel at the Investigative Hearing and if he has not retained counsel

himself the court will provide counsel.  Id. ¶ 10.  If the Investigative Judge concludes that there

is a sufficient basis to refer the accused for trial, the Judge writes a report which includes charges against the accused and forwards the report to a panel of trial judges.  Id. ¶ 8.

The trial consists of a Trial Panel of three judges, with a presiding judge who conducts the proceedings.  Id. ¶ 9.  The Trial Panel reviews the findings of the Investigative Judge and listens to any additional evidence in a formal courtroom setting.  Id.  Trial Panel judges may ask questions, similar to the process used in the Investigative Hearing.  Id.  The accused is entitled to counsel at the trial, although defense counsel and prosecutors have more limited roles than do their counterparts in the American adversarial system.  Id.  At the end of the trial, the Trial Panel enters a verdict and either orders the release of the defendant or sentences him.  Id.

At the request of the government of Iraq, MNF-I maintains physical custody of detainees while their cases are being heard by the CCCI.  Id. ¶ 17.  Although United States Armed Forces participate in the detention, they do so not qua the United States but as part of their role in MNF-I.  Detainees are held as security internees in accordance with U.N. Security Council Resolutions 1546 and 1637 until their cases are resolved.  Id.  If they are convicted and sentenced to a term of imprisonment, the Trial Court will issue an order and send it to the Deputy Commanding General for Detainee Operations of MNF-I ("DCG-DO").  Id.  After the DCG-DO receives the Trial Court order, the DCG-DO will subsequently issue a transfer order releasing the detainee to an Iraqi Ministry of Justice facility, and the detainee typically will be transferred within two to three weeks.  Id.

Munaf is currently in MNF-I physical custody and has previously appeared at four CCCI Investigative Hearings on November 23, 2005, January 19, 2006, February 15, 2006, and February 28, 2006, each time with the assistance of his own Iraqi counsel.  Id. ¶¶ 10, 15.  In two

of his appearances, Munaf was a witness against the other defendants involved in the

kidnapping. Id. ¶ 15.  In his other two appearances, Munaf was a defendant in his own case. Id.

At all four of the Investigative Hearings, Munaf positively identified the other kidnappers and

admitted to his role in the kidnapping scheme. Id. ¶ 16.  The Investigative Hearing Judge

concluded that sufficient evidence exists to refer Munaf's case to the Trial Court as a defendant.

Id.  Munaf's trial was originally scheduled to occur on September 10, 2006, but was then

postponed until September 19, 2006.  Id.

**D.     Petitioner's Habeas Petition and Motion For TRO**

On August 18, 2006, months after the Iraqi government had decided to institute criminal

proceedings against Munaf and months after his appearances before CCCI Investigative

Hearings, Munaf's sister, with the assistance of counsel, filed a Petition for Writ of Habeas

Corpus on behalf of Munaf as his purported next friend in this Court. See Petition.  The Petition

asserts that Munaf is held in United States custody in violation of various provisions of the

United States Constitution, the laws of the United States, and obligations of international law,

and that this Court has federal habeas jurisdiction to consider Munaf's Petition. See id. ¶¶ 5, 8-9,

30-47.  For relief, petitioners ask the Court, among other things, to issue a writ of habeas corpus

requiring respondents to release Munaf from detention and produce him for a hearing before a

United States court to justify his continued detention. Id. at 12.  The Petition also seeks an

injunction prohibiting the United States from transferring Munaf to the custody of another

sovereign. Id. at 13.

After an inquiry from petitioners' counsel regarding the status of proceedings in Iraq

regarding Munaf, by email on August 31, 2006, respondents' counsel informed petitioners'

counsel that the government of Iraq had previously instituted criminal proceedings against Munaf, and that he already had appeared at Investigative Hearings before the CCCI.  <u>See</u> August 31, 2006 Email from N. White to J. Margulies (attached as Exhibit 5).  Petitioners' counsel was also informed that Munaf's case had been referred for trial, which then was scheduled to occur on September 10, 2006, and that Munaf would be subject to transfer to the physical custody of Iraq only if he were convicted and after administrative documentation was completed, which post-conviction and release process typically takes two to three weeks to finalize.  <u>Id.</u> Thereafter, on September 8, 2006, petitioners filed their instant motion for a temporary restraining order seeking to prevent Munaf's transfer to Iraqi authorities until the Court has reviewed Munaf's habeas petition on the merits.  <u>See</u> Petitioners' Motion for a Temporary Restraining Order Preventing Petitioner Mohammad Munaf's Transfer to Iraqi Authorities (dkt. no. 6) (Sept. 8, 2006).

<u>**ARGUMENT**</u>

**I.    A TEMPORARY RESTRAINING ORDER IS EXTRAORDINARY RELIEF.**

It is well-established that a request for temporary restraining order "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  <u>Mazurek v. Armstrong</u>, 520 U.S. 968, 972 (1997); <u>Cobell v. Norton</u>, 391 F.3d 251, 258 (D.C. Cir. 2004).  As discussed further below, this is particularly true where, as here, the relief sought intrudes into core functions of the Executive – namely, the conduct of the Nation's foreign relations and military affairs.  To prevail in a request for a temporary restraining order, a movant "must 'demonstrate 1) a substantial likelihood of success on the merits, 2) that [he] would suffer irreparable injury if the injunction is not granted, 3) that an

injunction would not substantially injure other interested parties, and 4) that the public interest would be furthered by the injunction.'"[3]  See Katz v. Georgetown Univ., 246 F.3d 685, 687-88 (D.C. Cir. 2001) (quoting CityFed Financial Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir. 1995)).

In particular, the irreparable harm that must be shown to justify temporary injunctive relief "must be both certain and great; it must be actual and not theoretical."  Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985).  "Injunctive relief will not be granted against something merely feared as liable to occur at some indefinite time; the party seeking injunctive relief must show that the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm."  Id. (citations and internal quotation marks omitted; emphasis in original).  Accordingly, the power to issue such exceptional relief should be used sparingly.  See Dorfmann v. Boozer, 414 F.2d 1168, 1173 (D.C. Cir. 1969); Guam Indus. Services, Inc. v. Rumsfeld, 383 F. Supp. 2d 112, 116 (D.D.C. 2005).

Petitioners' motion does not satisfy the requirements for a temporary restraining order, and therefore should be denied.

---

[3]  The same legal standards apply for issuance of a temporary restraining order and a preliminary injunction.  See Vencor Nursing Centers, L.P. v. Shalala, 63 F. Supp. 2d 1, 7 n.5 (D.D.C. 1999).

II.    **PETITIONERS ARE NOT LIKELY TO SUCCEED ON THE MERITS OF THIS CASE.**

"'Likelihood of success is the main bearing wall of the four-factor framework'"

applicable to motions for preliminary relief.  Katz v. Georgetown Univ., 246 F.3d 685, 687-88

(D.C. Cir. 2001) (quoting Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 16 (1st

Cir.1996)).  Here, petitioners' efforts to establish that they are likely to succeed in this case

cannot bear much weight.

A.    **Federal Courts of the United States Lack Jurisdiction to Entertain a Petition for Habeas Corpus Brought by a Petitioner Who is in Custody Under International Authority in a Foreign Country During Ongoing Hostilities and Who Is Subject to the Authority of a Non-U.S. Tribunal.**

This Court's habeas power extends only to the extent that a detainee is in the custody of a

properly named respondent over which the Court has jurisdiction.  See 28 U.S.C. § 2242.  As the

uncontroverted evidence demonstrates, Munaf is in the custody of MNF-I acting under

international authority.  Gardner Decl. ¶¶ 3, 15.  As explained previously, MNF-I consists of a

coalition of forces from nations around the world, including the United States.  Id. ¶ 2.  U.S.

armed forces participate in MNF-I along with armed forces of many other nations, see supra note

1, but MNF-I is not the U.S. armed forces.  See id.  And while U.S. Armed Forces participate in

MNF-I's custody over Munaf, they do so as part of MNF-I pursuant to international authority

and not qua the United States.  MNF-I operates under United Nations Security Council

resolutions with the consent of the sovereign government of Iraq to maintain security and

stability in Iraq.  See U.N. Resolution 1546 ¶ 10 (June 8, 2004) (attached as Exhibit 2); U.N.

Resolution 1637 ¶ 1 (November 8, 2005) (attached as Exhibit 3).  This Court's habeas

jurisdiction, therefore, does not extend to Munaf's custodians.

The Supreme Court has spoken directly to the situation faced here.  In <u>Hirota v. General of the Army MacArthur</u>, 338 U.S. 197 (1948) (per curiam), the Court considered, and rejected for lack of jurisdiction, a habeas petition filed on behalf of several individuals who were in the custody of United States military personnel acting as part of the Allied Powers in Japan under the direct command of a General of the United States Armed Forces, and who had been convicted by an international military tribunal there that obtained its authority under the Allied Powers.  The Court noted that:

> The United States and other allied countries conquered and now occupy and control Japan.  General Douglas MacArthur [the respondent named in the petition] has been selected and is acting as the Supreme Commander for the Allied Powers.  The military tribunal sentencing these petitioners has been set up by General MacArthur as the agent of the Allied Powers.

<u>Id.</u> at 198.  The Court concluded that because "the tribunal sentencing these petitioners is not a tribunal of the United States," the "courts of the United States have no power" to grant the requested relief.  <u>Id.</u>  Thus, notwithstanding that the tribunal at issue was established by an American general, who was also named as a respondent to the petition, and that an American general maintained custody of these individuals, the Court held that United States courts lack jurisdiction to hear habeas claims by military detainees held by United States forces acting under international authority as part of a multinational force and thus denied the motions for leave to file habeas petitions.  As with Munaf, the petitioners in <u>Hirota</u> were not in the custody of the United States acting independently as the United States.  Instead, the American general who maintained custody of these individuals was detaining them as part of his participation in the Allied war effort and under the authority of the Allied Powers, not the United States.  <u>See</u> <u>id.</u> at 199 (Douglas, J., concurring) (indicating that petitioners were "under the custody of respondent

Walker, Commanding General of the United States Eighth Army who held them pursuant to the orders of respondent MacArthur, Supreme Commander for the Allied Powers."). Here, as in Hirota, to the extent that U.S. military authorities are involved in the detention of Munaf, they are maintaining custody of him pursuant to their role in and under the authority of the MNF-I and U.N. resolutions, not the United States qua United States. As such, this Court lacks jurisdiction to grant the relief requested by petitioners.

The year after Hirota was decided, the Court of Appeals for the D.C. Circuit followed Hirota in holding that a district court lacked jurisdiction over a habeas action brought by an individual "in custody in Germany, within the American Zone of Occupation" and "under custody of American Army forces" serving a sentence imposed by an international tribunal. Flick v. Johnson, 174 F.2d 983 (D.C. Cir. 1949). In Flick, the court interpreted Hirota as precluding jurisdiction by any United States court over a habeas claim brought by a person held in the physical custody of United States military officers under the authority of an international entity, which in Flick was the Allied Powers occupying Germany. Id. at 984-86. Despite the fact that the petitioner was in the custody of American forces, the court affirmed the dismissal of the habeas petition in light of the international authority under which the U.S. forces were acting and due to the fact that the military tribunal which tried and sentenced the petitioner was not a tribunal of the United States but rather was an international court that derived its authority from the Allied Powers. See id. at 985-86. Hirota, thus, is not a unique case, and its principles have been tested and applied in other contexts.

In addition, Hirota is controlling in the present case even though the petitioners in Hirota had been tried and convicted whereas Munaf is awaiting his trial before the CCCI. As an initial

matter, Munaf's case already has been reviewed by a military tribunal convened by MNF-I acting under international authority, which concluded that he should be detained as a security internee under the U.N. mandate. See Gardner Decl. ¶ 5. As a result, Munaf, like the petitioners in Hirota, is, in fact, being held based on a determination of a military tribunal acting under international authority.

Furthermore, the Court's decision in Hirota did not turn on the fact that the petitioners had been convicted; instead, the Court focused on the fact that the international military tribunal that did convict the petitioners was "not a tribunal of the United States," and concluded that United States courts have no power to grant petitioners habeas relief with respect to the actions of that tribunal. Hirota, 338 U.S. at 198. Just as the international military tribunal in Hirota was not a tribunal of the United States, neither is the CCCI or the MNF-I three-member panel a tribunal of the United States. Moreover, even though Munaf has not yet been tried and convicted by the CCCI, the Iraqi criminal process has commenced; Munaf has appeared at several CCCI Investigative Hearings, and a CCCI Investigative Hearing Judge has determined that there is sufficient evidence to begin his trial before a CCCI Trial Panel.[4]  And MNF-I's pre-trial detention of Munaf during his ongoing prosecution in the CCCI is no less a part of the mission of the multinational forces in Iraq operating pursuant to the U.N. Security Council's mandate than was the trial and conviction of the Hirota petitioners a part of the mission of the multinational forces acting on behalf of the Allied Powers. Accordingly, the logic of Hirota dictates that U.S. courts have no power to grant Munaf habeas relief with respect to his ongoing prosecution in the

_____

[4]  In this regard, Munaf's case is distinct from that of the petitioner in Omar who, at the time the district court entered its injunction, had not yet had any hearing before an Investigative Judge and thus whose criminal process had not yet commenced before the CCCI.

CCCI.

Nor does the fact that Munaf is a naturalized U.S. citizen, while the petitioners in <u>Hirota</u> were all Japanese aliens, save his case from <u>Hirota's</u> ruling. The citizenship of the petitioners played no role in the decision in <u>Hirota</u>. As explained above, the Supreme Court's jurisdictional ruling was grounded on the fact that the petitioners were subject to the authority of a tribunal that "was not a tribunal of the United States." 338 U.S. at 198. In fact, Justice Douglas criticized the majority's opinion because it turned solely on the fact that "the tribunal is international" not American, and did not consider other factors such as citizenship. 338 U.S. at 204-05. Justice Douglas's concurring opinion, however, is not the ruling of <u>Hirota</u>. In any event, citizenship may provide a basis for exercising habeas jurisdiction, even where the detention is abroad, but only when the individual is being held *by United States forces*. <u>See</u> <u>Rasul v. Bush</u>, 542 U.S. 466, 501-02 (Scalia, J., dissenting). Citizenship, in itself, however, is not a font of habeas jurisdiction when the individual is being held by a foreign or international body. Thus, <u>Hirota</u> is no less applicable simply because Munaf previously obtained U.S. citizenship.

Indeed, the decision in <u>Hirota</u> is consistent with the conclusions of other courts that have addressed the analogous situation of American citizens who are detained abroad by sovereign nations and are subject to those countries' criminal justice systems, but nevertheless seek habeas relief in U.S. courts. Courts routinely deny requests for habeas relief under such circumstances. In <u>Keefe v. Dulles</u>, 222 F.2d 390 (D.C. Cir. 1954), an American soldier stationed overseas was held by French authorities on charges brought by the French. The habeas petitioner (the soldier's wife) claimed that the Secretaries of State, Defense, and the Army had conspired to deprive the soldier of his rights in connection with his incarceration in a French prison. <u>Id</u>. at

391.  Despite these allegations, the court rejected out of hand the theory that it had jurisdiction to grant habeas relief.  Id. at 392 (concluding that "[t]he petition shows on its face that Keefe is not in the custody of the respondents" but rather is detained by French civil authorities).  Other courts have similarly concluded that it is inappropriate for United States courts to issue writs of habeas corpus in cases involving persons in the custody of foreign sovereign nations abroad.  See, e.g., Duchow v. United States, 1995 WL 425037, *1, *3 (E.D. La. 1995) (concluding that a U.S. citizen in pre-trial detention in Bolivia by the Bolivian government was not entitled to habeas relief because "it is the Bolivian government who has custody over plaintiff and would be required to produce the body.").  But for the fact that Iraq requested MNF-I assistance in maintaining custody of Iraq's pre-trial detainees, Munaf already would be in the exclusive custody of Iraq and his case would be no different than Keefe and Duchow.

Petitioners' exclusive reliance on the Supreme Court's decision in Hamdi v. Rumsfeld, 542 U.S. 507 (2004), to demonstrate that Munaf's habeas petition is likely to succeed is completely misplaced and fails to satisfy their burden.  See Petrs.' Mem. at 10-11.  The petitioner in Hamdi unquestionably was detained at the Naval Brig in South Carolina in the United States by United States forces who were acting only under the authority of the U.S. Constitution and laws of the United States, not as part of any multinational force or under any source of international authority.  Munaf, however, is being detained in Iraq, to which he voluntarily traveled, by United States forces pursuant to their participation in MNF-I and under the authority of United Nations resolutions.  Accordingly, Hamdi is completely inapplicable to Munaf's custodial situation, and the most analogous case to his is Hirota – a case petitioners tellingly fail to cite.  As a result, this Court lacks jurisdiction to consider Munaf's habeas petition

and his request for a temporary restraining order should be denied.

**B.      The Temporary Restraining Order Would Violate Fundamental Principles Of Separation of Powers and Require the Court to Determine Non-Justiciable Questions.**

Even if the Court were to reach the remarkable conclusion that Munaf is not being held pursuant to international authority and that the Court has habeas jurisdiction in this case, the Court may not grant petitioners the injunctive relief they seek because it would violate fundamental principles of the constitutional separation of powers by interfering in the Executive's purview over foreign relations, military affairs, and national security matters in several respects and would require the Court to answer non-justiciable political questions.

**1.      The Court Must Refrain from Interfering with the Relationship between a Multinational Force and a Foreign Government.**

Petitioners' request for a TRO prohibiting Munaf's transfer to the custody of Iraqi authorities is beyond the authority of this Court to issue because it would interfere with the relationship between MNF-I and Iraq, developed under the auspices of U. N. resolutions, pursuant to which MNF-I will transfer physical custody of detainees to Iraq upon their conviction and sentencing by a Trial Panel in the CCCI.[5]  <u>See</u> Gardner Decl. ¶ 17.  By issuing

---

[5]  Petitioners, who were advised on August 31, 2006 that Munaf's criminal trial before the CCCI was scheduled to commence on September 10, 2006 and who waited until September 8, 2006 to file for a TRO and requested briefing to go on through September, do not appear to seek an order prohibiting Munaf's trial in the CCCI from going forward.  Rather, they seem to wish to prevent Munaf's transfer to Iraqi physical custody in the event he is convicted and sentenced at the conclusion of his trial.  If petitioners were to ask the Court to prohibit Munaf's trial from proceeding, such an order would be even more problematic because it would directly interrupt an ongoing criminal prosecution by a foreign sovereign.  As discussed, Munaf has already appeared at Investigative Hearings at the CCCI and it was determined that there was sufficient evidence to refer his case for trial.  Gardner Decl. ¶ 15.  Munaf's trial in the CCCI is currently scheduled for September 19, 2006.  <u>Id.</u>  Just as principles of federal comity direct federal courts to abstain from interfering with pending state criminal proceedings, <u>see</u> <u>Younger</u>

such an order, the Court would be injecting itself into an exclusive Executive function: the United States military's role in MNF-I, a multinational coalition force dispatched at the request of the Iraqi government pursuant to U.N. resolutions to assist Iraq with its wartime security and rebuilding efforts. Such an order prohibiting the transfer of Munaf following his conviction in an Iraqi court would override the judgments and prior commitments of United States Executive Branch officials regarding the terms of the military's participation in MNF-I, as well as the scope of that participation vis-a-vis its coalition partners, Iraq, and United Nations authorities. A TRO in this case thus would intrude on the Executive's participation in and prosecution of the ongoing war in Iraq and its prerogative to conduct military affairs and foreign policy with other nations, including the United Nations, involved in MNF-I's activities.

Further, a court order interfering with the U.S. military's duties as a participant in MNF-I may compromise the Executive's substantial interest in maintaining good relations with Iraq and its MNF-I coalition partners. See Smith v. Reagan, 844 F.2d 195, 198 (4th Cir. 1988) (granting the relief sought by petitioners would "involve courts in matters of the most delicate diplomacy. A charge that a foreign government has 'unjustly deprived' an American citizen of liberty is likely to have far-reaching and unforeseeable effects on the conduct of foreign relations."). Because MNF-I is a distinct legal entity from the government of the United States, the injunctive relief suggested by petitioners would needlessly complicate and intrude upon the Executive's relations with the government of Iraq and its coalition partners during a time of war, by not

---

v. Harris, 401 U.S. 37 (1971) (indicating that notion of comity requires federal courts to have proper respect for state functions), similar principles of international comity instruct federal courts to avoid inserting themselves in the middle of pending foreign criminal proceedings. Cf. Hilton v. Guyot, 159 U.S. 113, 163 (1895) (discussing international comity).

permitting the transfer.  Indeed, because the TRO requested by petitioners would usurp the

Executive's authority to direct the manner in which U.S. military forces participate in a

multinational force, separation of powers principles dictate that the Court may not grant such

relief.  See, e.g. Haig v. Agee, 453 U.S. 280, 292 (1981) (recognizing that "[m]atters intimately

related to foreign policy and national security are rarely proper subjects for judicial

intervention").

In addition, the TRO requested by petitioners would interfere with the sovereign

government of Iraq's own decision to allow a multinational United Nations force to operate

within its borders to assist in its security and rebuilding efforts and to authorize coalition forces

to maintain physical custody of pre-trial detainees awaiting criminal prosecution in Iraqi courts

for crimes committed in Iraq, with the understanding that once a detainee is convicted and

sentenced he will be transferred to Iraqi custody and imprisoned in an Iraqi Ministry of Justice

Facility.  In this manner as well, the TRO would be inappropriate under principles of

international comity and the act of state doctrine.  See Banco Nacional De Cuba v. Sabbatino,

376 U.S. 398, 401 (1964) ("act of state doctrine in its traditional formulation precludes the courts

of this country from inquiring into the validity of the public acts a recognized foreign sovereign

power committed within its own territory").

### 2.    The Court Must Refrain From Judging the Fairness of a Foreign Government's Criminal Justice System under the Rule of Non-Inquiry.

One of the bases for Munaf's request for a TRO prohibiting his transfer to the custody of

Iraqi authorities is his complaint that he would not be treated fairly under the Iraqi criminal

justice system and that such a transfer "would deprive him of his rights to due process under the

Due Process Clause and Suspension Clause" of the U.S. constitution. See Petrs.' Mem. at 13-14. In the analogous context of extradition cases, however, the Supreme Court and courts of appeals have long recognized that fundamental separation of powers principles preclude a court from second-guessing decisions by the Executive Branch concerning conditions in foreign countries for individuals being transferred for criminal justice purposes.

In Neely v. Henkel, 180 U.S. 109 (1900), for example, the Supreme Court held that a United States citizen could not challenge the fairness or legitimacy of Cuba's judicial process in resisting extradition to Cuba to stand trial for crimes committed in Cuba surrounding United States military occupation of that island following the Spanish-American War. The Court emphasized that the extradition was inextricably connected to the policy of the United States, reflected in international agreements, to rebuild and support the independent government of Cuba, id. at 121-22, 123-25, and was related to sensitive military affairs – including the nature and duration of the U.S. military occupation of Cuba – raising political questions that were inherently "the function of the political branch of the Government to determine," id. at 124.

Neely claimed that extradition would violate his constitutional rights because Cuba's judicial system did not afford the same level of due process provided in American courts, similar to Munaf's assertion that "if he were to be turned over to the Iraqi criminal system," he would "be subject to indefinite imprisonment without due process." Petrs.' Mem. at 14. The Court rejected Neely's argument, as "citizenship does not give him an immunity to commit crime in other countries, nor entitle him to demand, of right, a trial in any other mode than that allowed to its own people by the country whose laws he has violated." 180 U.S. at 123.

Thus, as a general matter, "[w]hen an American citizen commits a crime in a foreign

country, he cannot complain if required to submit to such modes of trial and to such punishment as the laws of that country may prescribe for its own people." Id.  That is because the guarantees of the United States Constitution "have no relation to crimes committed without the jurisdiction of the United States against the laws of a foreign country." Id. at 122.  The Court reached that conclusion in Neely in the context of a habeas petition filed by a United States citizen *in this country* seeking to prevent his return to Cuba to face justice before the Cuban criminal justice system.  The same principles apply *a fortiori* where, as here, the habeas petitioner is detained by military officials *in the foreign land* where he is sought to be tried by the local authorities for offenses committed there.

The Court of Appeals for the D.C. Circuit invoked the same basic limitations imposed on federal court jurisdiction by constitutional separation of powers principles in Holmes v. Laird, 459 F.2d 1211 (D.C. Cir.), cert. denied, 409 U.S. 869 (1972).  That case involved the interaction between the United States and Germany regarding United States service member citizens accused of criminal acts in Germany.  These citizens were retained in the custody of the United States military during the pendency of judicial proceedings against them in the German courts. Id. at 1214.  After they were convicted in those courts, the Holmes petitioners fled to the United States, where they again came under United States military custody, and, much like Munaf in the present case, sought a habeas writ preventing their forced return to Germany to serve their sentences.  Id.       The court denied that attempt, noting that Germany's power to try and convict even United States citizens for crimes committed within its territory was "complete." Id. at 1216 & nn.34 & 35.  The Court then rejected the petitioners' invitation to examine the fairness of their treatment by the German courts, and declined to enjoin the transfer, finding that it lacked

jurisdiction over the matter because "the contemplated surrender of appellants to the Federal Republic of Germany is a matter beyond the purview of this court." Id. at 1225.  Similarly here, the potential transfer of Munaf to Iraqi custody if he is convicted and sentenced after his trial in an Iraqi court for crimes that occurred in Iraq is beyond the purview of this Court.  This Court therefore has no basis for enjoining the transfer to consider whether, or to what extent, Munaf would be afforded due process in the CCCI proceedings.

The decisions in Neely and Holmes belong to a well-established line of judicial rulings refusing, for separation of powers reasons, to review Executive decisions to turn over individuals to foreign governments for criminal prosecution or to serve a criminal sentence.  Under this doctrine, known as the Rule of Non-Inquiry, the surrender of a fugitive to a foreign government is "purely a national act" which is "performed through the Secretary of State," within the Executive's "powers to conduct foreign affairs."  In re Kaine, 55 U.S. 103, 110 (1852); see also Shapiro v. Secretary of State, 499 F.2d 527, 531 (D.C. Cir. 1974) (per curiam) (noting that "extradition is ordinarily a matter within the exclusive purview of the Executive").

The Rule of Non-Inquiry "is shaped by concerns about institutional competence and by notions of separation of powers."  United States v. Kin-Hong, 110 F.3d 103, 110 (1st Cir. 1997).  As the Second Circuit has observed, "[t]he interests of international comity are ill-served by requiring a foreign nation . . . to satisfy a United States district judge concerning the fairness of its laws and the manner in which they are enforced.  It is the function of the Secretary of State to determine whether extradition should be denied on humanitarian grounds."  Ahmad v. Wigen, 910 F.2d 1063, 1067 (2d Cir. 1990) (citation omitted).  Thus, under the Rule of Non-Inquiry, "courts in this country refrain from examining the penal systems of requesting nations, leaving to

the Secretary of State determinations of whether the defendant is likely to be treated humanely."

Lopez-Smith v. Hood, 121 F.3d 1322, 1327 (9th Cir. 1997); accord Kin-Hong, 110 F.3d at 110;

see also Al-Anazi v. Bush, 370 F. Supp. 2d 188, 194-95 (D.D.C. 2005) (denying Guantanamo

Bay detainee's request for thirty days' notice prior to being transferred to another country based,

in part, on Rule of Non-Inquiry).[6]

In this regard, courts are not to consider evidence regarding the requesting country's "law

enforcement procedures and its treatment of prisoners"; such evidence is irrelevant and improper

in a court challenge to extradition. Ahmad, 910 F.2d at 1067. As the First Circuit concluded,

"[i]t is not that questions about what awaits the [fugitive] in the requesting country are irrelevant

to extradition; it is that there is another branch of government, which has both final say and

greater discretion in these proceedings, to whom these questions are more properly addressed."

Kin-Hong, 110 F.3d at 111. Accordingly, Munaf's fear that he would be tortured if transferred

to Iraqi custody following his trial is not a justifiable basis for this federal court to enjoin his

potential transfer. As mentioned previously, U.S. Executive Branch authorities did not object to

Iraq's plans to prosecute Munaf in the CCCI, Gardner Decl. ¶ 6, and this Court should not

second-guess that decision.

The separation of powers concerns in this case are even stronger than in the traditional

extradition context and require the Court to deny petitioners' request for a TRO. First, Munaf's

detention, trial, and punishment for offenses committed in Iraq implicates vital military decisions

---

[6] In Attash v. Bush, Case No. 05-1592 (D.D.C.), this Court also denied a Guantanamo Bay detainee's motion for a preliminary injunction requiring advance notice of transfer "for the reasons well stated by Judge Bates in Al-Anazi v. Bush." See Order (dkt. no. 12) (Sept. 1, 2005).

and sensitive foreign relations matters in an area of active combat operations; and second, Munaf

is not on American soil awaiting extradition to a foreign country; he is already in the territory of

Iraq, where he went of his own free will and where he is being prosecuted for crimes in violation

of Iraqi law.  He cannot attempt to use the habeas remedy of a federal court in the United States

to escape the judicial system of the country where he chose to be and is being held in custody.

Accordingly, the separation of powers principles that preclude judicial review of a foreign

sovereign's judicial process in traditional extradition cases also forbid the unprecedented and

intrusive injunctive relief sought by petitioners in this area of heightened separation of powers

concerns.

**3.    Munaf's Request for a TRO Requires the Court to Determine Non-Justiciable Political Questions.**

Both Munaf's habeas petition and his request for a TRO raise quintessential political

questions beyond the authority or competence of the judiciary to answer.  The political question

doctrine is a product of the constitutional separation of powers, see Baker v. Carr, 369 U.S. 186,

210 (1962), and "courts lack jurisdiction over political decisions that are by their nature

'committed to the political branches to the exclusion of the judiciary.'"  Schneider v. Kissinger,

412 F.3d 190, 193 (D.C. Cir. 2005), cert. denied, 126 S. Ct. 1768 (2006) (quoting Antolok v.

United States, 873 F.2d 369, 379 (D.C. Cir. 1989).

The Supreme Court has established several factors that individually or in combination

may be used to identify non-justiciable political questions.  See Baker, 369 U.S. at 217.  Chief

among those factors is a textually demonstrable constitutional commitment of the issue to a

coordinate political department.  Id.  As demonstrated above, this case directly implicates foreign

policy decisions and military functions that are reserved for the Executive Branch under Article

II of the Constitution.  See Schneider, 412 F.3d at 194-95 (explaining that Article II of the

Constitution "provides allocation of foreign relations and national security to the President, the

unitary chief executive" and that "decision-making in the fields of foreign policy and national

security is textually committed to the political branches of government."); see also Bancoult v.

McNamara, 445 F.3d 427, 433 (D.C. Cir. 2006) (finding that "national security and foreign

relations" are "topics that serve as the quintessential sources of political questions.").  As

discussed, Munaf's habeas petition and his request for a TRO would force the judiciary to

interfere in the Executive's determination to deploy military forces to participate in an

international peace-keeping force and override the Executive's authority to direct the manner in

which such military forces perform their duties with respect to the multinational force.  Judicial

involvement in such military operations ordinarily is improper.  See Department of the Navy v.

Egan, 484 U.S. 518, 530 (1988) (indicating that "courts traditionally have been reluctant to

intrude upon the authority of the Executive in military and national security affairs.").  In

particular, judicial inquiry into the manner in which the Executive interacts with multinational

coalitions authorized by the United Nations are non-justiciable political questions.  See U.S. ex

rel. New v. Rumsfeld, 350 F. Supp. 2d 80, 96-100 (D.D.C. 2004) (holding that legal challenge to

the manner in which the Executive deploys military forces pursuant to a multinational United

Nations peacekeeping initiative presents non-justiciable political questions); United States-South

West Africa/Namibia Trade and Cultural Council v. United States, 90 F.R.D. 695, 698 (D.D.C.

1981) (holding that legal challenge to the United States' appropriation of funds to the United

Nations for the purpose of supporting the recognized government of Namibia presents

non-justiciable political questions).

In addition, the TRO sought by Munaf would undermine the United States' foreign policy decisions to support and facilitate the establishment and growth of a successful Iraqi justice system, in part, by acting through the MNF-I to hold persons during their prosecution before the Iraqi courts, and to turn individuals over to Iraqi authorities upon their conviction by that court. This is precisely the type of foreign policy action that is outside the realm of the courts. See People's Mojahedin Org. v. Department of State, 182 F.3d 17, 23 (D.C. Cir. 1999) (explaining that "it is beyond the judicial function for a court to review foreign policy decisions of the Executive Branch."). As demonstrated, petitioners' requests for relief would require the Court to intertwine itself directly into foreign policy matters and military issues that are committed to the Executive. As a result, the Court lacks authority to entertain these fundamental political questions.[7]

### C.    The Decision in Omar v. Harvey is Distinguishable from the Present Case and Does Not Compel this Court to Issue a TRO.

Petitioners rely heavily on Judge Urbina's decision in Omar v. Harvey, 416 F. Supp. 2d 19 (D.D.C. 2006), which granted Omar's motion for a preliminary injunction preventing him from being removed from United States or MNF-I custody. See Petrs.' Mem. at 4-5. Contrary to petitioners' assertions, the material facts and legal issues of Munaf's case and Omar's case are

---

[7] This case also satisfies many of the other factors indicative of political questions. See Baker, 369 U.S. at 217. In particular, in light of the fact that matters of foreign policy and the deployment of the military are Executive functions, a court order prohibiting the U.S. contingent of MNF-I from transferring Munaf to Iraqi authorities following his conviction by an Iraqi court would undoubtedly express a lack of respect due to the Executive in these areas, which also indicates that the Court is faced with a political question. See id. Additionally, if the Court were to enjoin Munaf's transfer, it would also certainly result in embarrassment to the United States due to the contradictory pronouncements from the Judiciary and the Executive with respect to the U.S. contingent of MNF-I's willingness to transfer detainees convicted and sentenced by Iraqi courts to the custody of the Iraqi Ministry of Justice. See id.

not identical. Instead, unlike Omar, who had not been presented to a CCCI Investigative Hearing and whose criminal prosecution before the CCCI thus had not yet begun at the time of the Court's ruling, Munaf's criminal prosecution before the CCCI already has commenced; he already has made multiple appearances at CCCI Investigative Hearings and an Iraqi Investigative Judge has determined that there is sufficient evidence to refer his case for trial. See Gardner Decl. ¶¶ 15-16. Further, Munaf is an American-Iraqi citizen born in Baghdad, see Petition ¶ 17, whereas Omar is an American-Jordanian citizen. Thus, in Munaf's case, the government of Iraq is in the midst of prosecuting one of its own citizens, unlike the situation in Omar. For these reasons, the relief requested in the case at hand would result in an even greater affront to the sovereign government of Iraq and a deeper intrusion of the judiciary into the foreign policy and military decisions of the Executive than what was presented in Omar.

In addition, respondents appealed the grant of the preliminary injunction in Omar and the D.C. Circuit heard oral argument in the case on September 11, 2006. See Omar v. Harvey, No. 06-5126 (D.C. Cir.).[8] Moreover, this Court is under no obligation to adhere to the district court's

---

[8] Petitioners' alternative request to issue a TRO pending a decision by the D.C. Circuit in the Omar appeal is unwarranted and improper for the very same reasons their request for a TRO pending a review of the merits of Munaf's habeas petition is unwarranted and improper, which are stated herein. In other words, a TRO is not warranted regardless of the benchmark used to determine its duration. Furthermore, petitioners' reliance on the usefulness of stays pending appeals, see Petrs.' Mem. at 16, is unavailing. A stay of proceedings in a case pending the resolution of issues on appeal is entirely distinct from a TRO interfering with a foreign government's criminal justice system and with the Executive's authority over military and foreign affairs while an appeal in a different case is under consideration. In any event, for many of the reasons explained herein and in the appellants' brief in Omar, the district court's decision in Omar should be overturned, and this Court should not follow it.

decision in <u>Omar</u>.[9]  "Even where the facts of a prior district court case are, for all practical

purposes, the same as those presented to a different district court in the same district, the prior

resolution of those claims does not bar reconsideration by [another] [c]ourt of similar

contentions.  The doctrine of *stare decisis* does not compel one district judge to follow the

decision of another."  <u>Threadgill v. Armstrong World Indus., Inc.</u> 928 F.2d 1366, 1371 (3rd Cir.

1991) (internal citations and quotations omitted); <u>see also</u> <u>United States v. Article of Drugs</u>

<u>Consisting of 203 Paper Bags</u>, 818 F.2d 569, 572 (7th Cir. 1987) (indicating that single district

court decision has little precedential effect and is not binding on other district judges in the same

district).

### D.    Because Transfer to Iraqi Authorities Would Provide Full Habeas Relief for Munaf, It Cannot Be Prohibited.

One of petitioners' stated purposes for their request for a TRO prohibiting Munaf's

transfer to the custody of Iraqi authorities is to preserve the Court's jurisdiction so that it may

protect Munaf's purported habeas rights.  <u>See</u> Petrs.' Mem. at 1, 13.  However, the release from

the custody of United States military personnel that Munaf's transfer to the custody of Iraqi

authorities would effectuate is the sum total of the habeas relief that Munaf could be entitled to if

the Court fully adjudicated Munaf's habeas petition on the merits.  In other words, transfer of

Munaf to Iraqi custody would grant all of the relief Munaf might get pursuant to a habeas writ

because it would terminate his custody by United States military officers.  And there is no

_____

[9]  Significantly, in <u>Omar</u>, the court did not determine conclusively that it had jurisdiction or that the case was justiciable; instead, the court merely stated that "[w]ithout resolving the factual dispute between the parties, the court determines that the case at bar 'raise[s] questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation . . . .'" <u>Omar</u>, 416 F. Supp. 2d at 23-24 (quoting <u>Washington Metro. Area Transit</u> <u>Comm'n v. Holiday Tours, Inc.</u>, 559 F.2d 841, 844 (D.C. Cir. 1977)).

material difference between transferring Munaf directly to Iraqi authorities and merely releasing

him outright in Baghdad, because even if were released in Baghdad, the government of Iraq

would have the authority to immediately detain him.

A federal court can no more enjoin the release of Munaf to the custody of the government

of Iraq for prosecution of offenses committed there than it could enjoin the release of a prisoner

in federal custody with a pending habeas action challenging his federal detention to state custody

to answer for offenses committed in the state. In both situations, the release of the detainee from

his current custody affords him all the relief he could obtain in his pending habeas action. An

order barring Munaf's release and transfer to the custody of Iraq therefore would in effect grant

him more relief than he could obtain if he were successful in his habeas action, i.e. his release

from his current custody. Although Munaf may wish to have this Court ultimately order his

outright release to freedom in a country of his choice, such an order would far exceed the

traditional province of the habeas writ and would be beyond the authority of this Court. See Al-

Anazi v. Bush, 370 F. Supp. 2d 188, 198 n.10 (D.D.C. 2005) (explaining that court "has no

authority to prevent a foreign sovereign from pursuing an independent law enforcement action

against a detainee, or to order the United States to transfer a detainee to the country of his

choosing. Such matters involve diplomatic and foreign policy considerations which are

generally the exclusive purview of the Executive."). Accordingly, it would be paradoxical and

improper for the Court to issue a temporary restraining order prohibiting the full extent of relief

that petitioners could possibly merit with respect to their underlying habeas petition simply to

preserve the Court's jurisdiction to consider the habeas petition. See id. at 196 ("[T]here is no

justification for issuance of an injunction pursuant to the All Writs Act when petitioners are

obtaining the same relief through transfer that they could hope to obtain through habeas.").[10]

For the foregoing reasons, petitioners have failed to carry their burden of demonstrating that their habeas petition is likely to succeed on its merits, and their motion for a TRO must fail.[11]

_____

[10] As noted, in <u>Attash v. Bush</u>, Case No. 05-1592 (D.D.C.), this Court adopted the reasoning in <u>Al-Anazi</u> in denying a Guantanamo Bay detainee's motion for a preliminary injunction requiring advance notice of transfer.  <u>See</u> <u>Attash</u>, Order (dkt. no. 12) (Sept. 1, 2005).

[11] Petitioners also fail to establish a likelihood of success because they have not provided a legitimate legal basis for the relief they seek.  While they allude to the Convention Against Torture ("CAT") and the Foreign Affairs Reform and Restructuring Act ("FARR Act") of 1998, <u>see</u> Petrs.' Mem. at 12, neither of these provisions provides petitioners with a basis to pursue judicial relief.  Initially, the CAT does not apply extraterritorially such that Munaf can invoke its provisions from Iraq.  <u>Cf.</u> <u>Sale v. Haitian Centers Council, Inc.</u>, 509 U.S. 155, 178-187 (1993) (finding that U.N. Convention Relating to Status of Refugees does not have extraterritorial application).  Additionally, numerous courts have held that the CAT does not give rise to judicially enforceable rights.  <u>See</u> <u>Khalid v. Bush</u>, 355 F. Supp. 2d 311, 327 (D.D.C. 2005) (Leon, J.); <u>Auguste v. Ridge</u>, 395 F.3d 123, 132 n.7 (3d Cir. 2005); <u>Hawkins v. Comparet-Cassani</u>, 33 F. Supp. 2d 1244, 1257 (C.D. Cal. 1999), <u>other orders rev'd</u>, 251 F.3d 1230 (9th Cir. 2001); <u>White v. Paulsen</u>, 997 F. Supp. 1380, 1386-87 (W.D. Wash. 1998); <u>Matter of Extradition of Cheung</u>, 968 F. Supp. 791, 802-03 & n.17 (D. Conn. 1997).  Further, courts also have determined that, in cases that do not involve a final order of removal under section 242 of the Immigration and Nationality Act, such as Munaf's, the FARR Act does not create jurisdiction to review CAT claims.  <u>See</u> <u>Al-Anazi v. Bush</u>, 370 F. Supp. 2d 188, 194 (D.D.C. 2005) (Bates, J.) (rejecting petitioners' argument that FARR Act could serve as legal basis for prohibiting or limiting transfer of wartime detainees to other countries); <u>O.K. v. Bush</u>, 377 F. Supp. 2d at 118 n.17 (same); <u>Khalid</u>, 355 F. Supp. 2d at 327 n.21 (same).  Therefore, the Court does not have jurisdiction to grant an injunction based on any perceived risk of a violation of the CAT.

In addition, petitioners' passing reference to the All Writs Act fares no better.  <u>See</u> Petrs.' Mem. at 15-16.  Although the All Writs Act empowers district courts to issue injunctions to protect their jurisdiction, the proposed injunction in this case would purportedly protect jurisdiction the district court does not have.  <u>See</u> <u>S.E.C. v. Vision Communications, Inc.</u>, 74 F.3d 287, 291 (D.C. Cir. 1996); <u>Almurbati v. Bush</u>, 366 F. Supp. 2d 72, 80 (D.D.C. 2005) (concluding that the All Writs Act is inapplicable once the petitioner is no longer held in United States custody).  Because Munaf is in the custody of MNF-I under international authority – as distinct from the custody of the United States government – the Court was never seized of jurisdiction over his petition <u>ab</u> <u>initio</u>.  Furthermore, the All Writs Act does not enlarge the jurisdiction of the federal courts and thus cannot confer jurisdiction where it is otherwise lacking.  As explained

III.    **PETITIONERS HAVE NOT ESTABLISHED THAT MUNAF FACES CERTAIN AND IMPENDING IRREPARABLE HARM.**

As indicated previously, the irreparable harm that must be shown to justify temporary injunctive relief "must be both certain and great; it must be actual and not theoretical." Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985). "Injunctive relief will not be granted against something merely feared as liable to occur at some indefinite time; the party seeking injunctive relief must show that the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." Id. (citations and internal quotation marks omitted; emphasis in original).

Petitioners assert that without the temporary injunctive relief they seek, Munaf will be irreparably harmed by being subjected to physical torture, by losing his purported ability to challenge his detention in federal court, and by being deprived of his constitutional rights to due process by being subjected to the Iraqi criminal justice system. See Petrs.' Mem. at 11-14. Contrary to petitioners' contentions, Munaf's risk of being tortured in an Iraqi prison is not certain, great, or imminent to justify the relief sought; rather, his assertions in this regard are entirely speculative, unfounded, and merely feared to occur. Petitioners primarily rely on reports of abuse in detention facilities operated by the Iraqi Ministry of the Interior. As explicitly noted in petitioners' brief, "[t]he vast majority of allegations concern forces of the Iraqi Ministry of the Interior, as well as members of the Iraqi armed forces under Ministry of Defense authority." Petrs.' Mem. at 6 (quoting Human Rights Watch, World Report 2006, at 450 (2006)). MNF-I,

herein, the Court lacks jurisdiction in this case under the teachings of Hirota and the principles of separation of powers. Consequently, the Court lacks legal authority to issue injunctive relief pursuant to the All Writs Act.

however, transfers detainees only to the custody of Ministry of Justice officials. Gardner Decl. ¶ 17. Upon conviction and sentencing, therefore, Munaf would be transferred from MNF-I to the custody of Iraq's Ministry of Justice in a detention center operated by Iraq's Ministry of Justice. See id. As a result, Munaf's fears of being subject to torture if transferred to an Iraqi prison are entirely speculative and unwarranted and do not merit the relief requested.[12]

In addition, as explained above, because Munaf consistently has been in the custody of MNF-I under international authority, not the United States, since his arrest in Iraq, he has never been subject to this Court's habeas jurisdiction. See Hirota v. General of the Army MacArthur, 338 U.S. 197 (1948).[13] Accordingly, he cannot claim to be at risk of losing an opportunity for habeas relief that he never had to begin with.

Furthermore, as discussed previously in section II.B.2., under the Rule of Non-Inquiry, Munaf's constitutional rights to due process did not follow him when he traveled to Iraq and committed crimes in that country. See, e.g., Neely v. Henkel, 180 U.S. 109, 122, 123 (1900) (finding that "[w]hen an American citizen commits a crime in a foreign country, he cannot complain if required to submit to such modes of trial and to such punishment as the laws of that

---

[12] Petitioners attempt to bolster their claim of irreparable harm with speculative opinion testimony from a self-styled expert who does not purport to have any personal knowledge or involvement with the particular situation or circumstances facing the petitioner in this case. See Declaration of Curt Goering (Exhibit C to Pets.' Mem.). Despite this tenuous basis, Mr. Goering not only makes sweeping assertions – "Iraqi government forces do not adhere to the rule of law"– but factually incorrect assertions as well – "Iraqi government forces have not established a functioning judicial system." See Goering Decl. ¶¶ 3, 5. Petitioners are not clear about whether the Goering Declaration is intended as fact testimony or as expert testimony, but either way it is improper and cannot provide a basis for the injunctive relief sought in this case.

[13] The same is true notwithstanding that U.S. Armed Forces participate in Munaf's custody because they do so as part of their participating role in MNF-I under the authorization of U.N. Security Council resolutions and not qua the United States.

country may prescribe for its own people" because the guarantees of the United States
Constitution "have no relation to crimes committed without the jurisdiction of the United States
against the laws of a foreign country."). As a result, his fear of being deprived of his
constitutional rights to due process cannot form a basis for the relief requested.[14]

As demonstrated, petitioners have failed to establish that Munaf will be irreparably
harmed in the absence of the injunctive relief they seek.

## IV.    AN INJUNCTION WOULD DISSERVE THE PUBLIC INTEREST.

The public interest favors allowing the Executive Branch, which is constitutionally
vested with the authority both to conduct military functions and to engage in foreign affairs, to
act without undue intrusion within its constitutional sphere of responsibility. As one Judge of
this Court has held:

> [T]here is a strong public interest against the judiciary needlessly intruding upon
> the foreign policy and war powers of the Executive on a deficient factual record.
> Where the conduct of the Executive conforms to law, there is simply no benefit –
> and quite a bit of detriment – to the public interest from the Court nonetheless
> assuming for itself the role of a guardian ad litem for the disposition of these
> detainees. See People's Mojahedin Org., 182 F.3d at 23 ("[I]t is beyond the
> judicial function for a court to review foreign policy decisions of the Executive
> Branch.").

Al-Anazi, 370 F. Supp. 2d at 199. The so-called "facts" presented in petitioners' motion are
little more than unfounded allegations that are merely speculative. As explained previously,
Munaf's fear of being tortured is based on his incorrect assumption that he would be transferred
to the Iraqi Ministry of the Interior, and he does not enjoy rights under the U.S. Constitution

---

[14]  In any event, the CCCI affords ample procedural protections to defendants. For
example, evidence is presented through sworn testimony, a defendant is entitled to counsel, that
counsel is allowed to present questions, the defendant is allowed to refuse to answer questions,
and convictions and sentences may be appealed. See Gardner Decl. ¶¶ 8-9.

during his Iraqi prosecution for crimes committed in Iraq. Thus, Munaf's claims that the public

interest will be served by a TRO are unpersuasive. By contrast, the public interest is not well-

served when military functions during a time of war are needlessly interrupted and overly

burdened due to baseless allegations. Accordingly, the public interest would best be served if

the Court denied petitioners' request for injunctive relief.

## V.      PETITIONERS' REQUEST FOR DISCOVERY SHOULD BE DENIED.

Petitioner's alternative request for discovery is not warranted. See Petrs.' Mem. at 14-15

It is well settled that "[a] habeas petitioner, unlike the usual civil litigant in federal court, is not

entitled to discovery as a matter of ordinary course," and that "the 'broad discovery provisions'

of the Federal Rules of Civil Procedure [do] not apply in habeas proceedings." Bracy v.

Gramley, 520 U.S. 899, 904 (1997) (quoting Harris v. Nelson, 394 U.S. 286, 295 (1969)). As

the Supreme Court noted in Harris, "[s]uch a broad-ranging preliminary inquiry is neither

necessary nor appropriate in the context of a habeas corpus proceeding." 394 U.S. at 297. In

particular, the Supreme Court has observed that ordinary discovery procedures tend to be "be

exceedingly burdensome and vexatious" in the habeas corpus setting. Id. at 297. Of course, the

governmental interests in avoiding such burdens are many times magnified here, where the

burdens and intrusions that are "vastly increased" by discovery would fall on servicemembers

and commanders carrying out the United States Armed Forces' constitutionally entrusted

function of providing for the national defense, as part of their role in MNF-I. Such discovery,

thus, would insert the Judiciary further into the province of the Executive than is constitutionally

permissible and thereby would violate core separation of powers principles. In addition, it

cannot be seriously argued that what the Supreme Court called a "considerable tactical

advantage" in litigation and accordingly denied except in narrow circumstances to domestic

habeas litigants should be conferred on individuals charged with crimes in a foreign land where

the Nation has engaged its military force in ongoing hostilities.  Cf. Hamdi v. Rumsfeld, 542

U.S. 507, 538-39 (2004) (plurality opinion) (adjuring lower courts generally to "proceed with the

caution that is necessary" and to take only "prudent and incremental" steps when faced with

novel issues pertaining to petitions for writs of habeas corpus from detainees involved in the

current war on terror).

    Where, as here, the Court lacks jurisdiction to hear petitioners' claim and, in the words of

Hirota, "ha[s] no power" to grant the relief requested, Hirota, 338 U.S. at 198, there is no set of

facts that could entitle petitioners to relief.  Indeed, any jurisdictional discovery in this case

would be fruitless.[15]  Respondents note that United States Armed Forces participate in detaining

Munaf, but the critical point is that they do so as part of their role and assigned duties in MNF-I

under international authority, and not qua the United States.[16]  Thus, any discovery into the

_____

[15]  For these reasons, the discovery situation in Abu Ali v. Ashcroft, 350 F. Supp. 2d 28
(D.D.C. 2004) is distinguishable from the present case.  In Abu Ali, the petitioner alleged his
detention was at the behest and ongoing direction of United States officials, while the
government disputed that the United States was involved in his detention.  Id. at 67.  Thus, the
Court concluded that discovery was appropriate to determine whether petitioner's allegations
were true.  Id. at 69.  Here, by contrast, respondents recognize that members of the United States
Armed Forces participate in Munaf's detention, but this fact is not material to the jurisdictional
question before the Court because these forces do so as part of their role in MNF-I, which has
been authorized by the United Nations Security Council, with the consent of the government of
Iraq, to take all necessary steps to contribute to the maintenance of stability and security in Iraq.
See United Nations Resolution 1546 ¶¶ 9-11.

[16] For this reason, petitioners' suggestion that the degree to which the United States
Armed Forces participate in MNF-I vis-a-vis other coalition nations is not material.  The salient
fact is that action taken by United States Armed Forces in this regard is taken as part of its role in
MNF-I pursuant to international authority.

extent to which members of the United States Armed Forces – as opposed to the forces of

coalition partners – exercise control over Munaf would be pointless.  The jurisdictional issue

addressed here turns on the fact that Munaf is held by MNF-I pursuant to the international

authorization of the United Nations and no amount of discovery can change or alter this fact.

## **CONCLUSION**

For the reasons stated above, respondents respectfully oppose petitioners' motion for a

temporary restraining order and request that it be denied in all respects.


Dated: September 15, 2006                        Respectfully submitted,

                                                 PETER D. KEISLER
                                                 Assistant Attorney General

                                                 KENNETH L. WAINSTEIN
                                                 United States Attorney

                                                 /s/ Edward H. White
                                                 JOSEPH H. HUNT (D.C. Bar No. 431134)
                                                 VINCENT M. GARVEY (D.C. Bar No. 127191)
                                                 EDWARD  H. WHITE (D.C. Bar No. 468531)
                                                 Attorneys
                                                 U.S. Department of Justice
                                                 Civil Division, Federal Programs Branch
                                                 20 Massachusetts Avenue, N.W.  Room 6110
                                                 Washington, D.C. 20530
                                                 Tel: (202) 514-5108
                                                 Fax: (202) 318-4268
                                                 email: ned.white@usdoj.gov

                                                 Attorneys for Respondents