# EXHIBIT 1

IN THE UNITED STATES DISTRCT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MAISOON MOHAMMED, *et al.*, ) | |
| ) | |
| Petitioners, ) | |
| v. ) | Civil Action No. 06-1455 (RCL) |
| ) | |
| FRANCIS J. HARVEY, *et al.*, ) | |
| ) | |
| Respondents. ) | |

## DECLARATION OF JOHN D. GARDNER

I, Major General John D. Gardner, pursuant to 28 U.S.C § 1746, hereby declare and say as follows:

1. I currently serve as the Deputy Commanding General for Detainee Operations (DCG-DO) Multi-National Force-Iraq (MNF-I). In this capacity, I am charged with the responsibility for oversight in several areas, including:

- Safeguard and secure all persons who are in custody at the MNF-I detention centers and protected areas.

- Operation and focus of the MNF-I Joint Interrogation and Debriefing Center to provide high-quality actionable strategic, operational, and tactical intelligence to the warfighters.

- Maximize efficiency and provide due process in the referral of security internees and detainees to the Iraqi legal system.

- Integrate Iraqi leadership and partnership in all facets of Detainee Operations.

1

I make these statements based upon my personal knowledge and upon information made available to me in the performance of my official duties.

2. MNF-I is a coalition force consisting of approximately twenty-seven different nations that operates in accordance with the mandate of United Nations Security Council Resolutions (UNSCR) 1546 (2004) and 1637 (2005). Resolution 1637 extended the mandate of MNF-I for another year on behalf of and at the request of the Iraqi government. MNF-I is authorized "to take all necessary measures to contribute to the maintenance of security and stability in Iraq." Such measures include the ability to detain individuals "where this is necessary for imperative reasons of security."

3. Mr. Mohammed Munaf Mohammed (Munaf), a citizen of Iraq, Romania, and the United States, is in MNF-I custody pursuant to UNSCR 1546 and 1637, which allows MNF-I to intern individuals who are considered to be an imperative threat to the security of Iraq. He was captured by Coalition Forces on May 23, 2005.

4. Munaf was captured on May 23, 2005 during a targeted raid. He was detained by Coalition Forces for his suspected involvement in the kidnapping of foreign nationals (three Romanian journalists).

5. Following Munaf's capture, on July 18, 2005 a panel of three Military officers, acting in their capacity as members of MNF-I, conducted a comprehensive review of Munuf's status and detention. The panel reviewed the facts and circumstances surrounding the capture, interviewed witnesses, and considered available intelligence information. Munaf was present at the hearing and had the opportunity to hear the basis on which he was being detained, to make a statement, and to call witnesses who were

immediately available. The panel determined that Munaf was considered a security internee and should be further interned.

6. Subsequently, Munaf's case was referred to the Central Criminal Court of Iraq (CCCI) for adjudication. U.S. authorities indicated no objection to Iraqi plans to prosecute Mr. Munaf in the CCCI.

7. The CCCI in Baghdad is the only court in Iraq with nationwide jurisdiction, thereby eliminating venue and jurisdictional issues across the various courts of session among the 18 provinces. The CCCI has discretionary investigative and trial jurisdiction over all crimes that threaten the sovereignty of Iraq and crimes against Coalition Forces, including acts of terrorism. The CCCI operates under the Iraqi Penal Code of 1969 and the 1971 Iraqi Law on Criminal Proceedings. It is an Iraqi court under Iraqi governance and it is comprised of Iraqi judges who have attended the Iraqi Judicial School and is administered by the Iraqi Higher Juridicial Council.

8. The CCCI operates using a modified continental, inquisitorial judicial process, and not the English adversarial judicial system. The CCCI is divided into two chambers- an investigative court and a felony trial court. Under this system, the investigative judge conducts an investigative hearing in chambers to determine if there is sufficient evidence to warrant a trial. Witnesses provide sworn testimony and the investigative judge questions the witnesses to clarify their testimony. Defense counsel is allowed to present questions to the court for review. If the investigative judge accepts any question, he asks the question of the witness. Upon the conclusion of evidence presentation, the investigative judge questions the defendant, who is not required to respond. The investigative judge makes the determination of whether there are sufficient grounds to

forward the case to the Trial Court. If he finds there is sufficient evidence, he forwards a report of the investigative proceeding and recommends charges to the Trial Court.

9. The Trial Court sits in panels of three judges, who review the findings of the investigative judges and listen to any additional evidence in a formal courtroom setting. After a case is forwarded for trial, a Trial Panel may return the case for further investigation before a date is set for trial. Trial Panel judges may ask questions, similar to the process used in the investigative hearing. Upon the conclusion of the case, the Trial Panel judges enter a verdict and either release the defendant or sentence him, which can include a prison term. Sentences imposed by the Trial Court are those prescribed in the Iraqi Penal Code as amended by CPA orders. Sentences may be reduced at the discretion of the Chief Judge of the Trial Court while appeals are made to the Iraqi Court of Cassation.

10. Defendants are represented at the investigative hearing by counsel retained at their own expense or, more typically, by court-appointed defense counsel. Defense counsel at the investigative hearing functions primarily to ensure the defendant's procedural rights are not violated. The defendant is also entitled to court-appointed defense counsel for trial. Munaf is represented by his own Iraqi counsel.

11. Munaf admitted on camera, in writing, and in front of an Iraqi Investigative Hearing Judge that on 28 March 2005 he participated as an accomplice in the kidnapping of three Romanian journalists. Munaf was assisted by Ibrahim Al Giuburi (Munaf's brother-in-law) (Ibrahim), Omar Hayssam (the alleged mastermind of the kidnapping plan) (Hayssam), and Omar Mahmmod (Hayssam's brother).

12. Munaf has made several confessions in writing, on camera, and in front of an Iraqi Investigative Hearing Judge outlining the kidnapping plan he was involved in. According to Munaf's multiple statements he first met with Hayssam in January 2005 to discuss the kidnapping plans. The first plan was to kidnap the Romanian Senator Vasile Ion or a Romanian businessman. Hayssam had a close relationship with Senator Ion. Munaf allegedly refused to participate in this plan. The entire reason for Hayssam wanting to conduct a kidnapping stems from his intention to gain the support of the Romanian President Traian Basescu to develop new business in Romania. It appears that Hayssam was going to covertly help kidnap the victims, and then increase his own stature by negotiating their release.

13. According to Munaf, Hayssam developed another plan to kidnap Marie Jeanne Ion (the daughter of Senator Vasile Ion) and two other journalists when they traveled to Iraq. He came up with this plan after allegedly seeing the Al Jazeera story of the Italian journalists being kidnapped and held for ransom. In this plan, Munaf was to travel with Marie and the other two to Iraq ostensibly as their guide and translator and help facilitate the kidnapping. Hence, Munaf would act as though he was a kidnap victim too.

14. Munaf stated that he was contacted by Hayssam on March 21, 2005, and asked to follow the kidnapping plan. Munaf claims that he opposed the plan but that he agreed to it after much pressure was put on him to go along. Munaf met with Ibrahim in Iraq a few days before the kidnapping and received a more detailed description of the kidnapping plan. The kidnapping was to take place on March 28, 2005, at an arranged location about 70 kilometers outside of Baghdad. According to Munaf, on the morning

of March 28, Munaf met with Ibrahim and a man named Hagji (the apparent contracted kidnapper). Hagji asked for $30,000 – half to be paid before the kidnapping, and half to be paid after the kidnapping. Munaf only had $14,000 at the time, so he called Hayssam to send him the rest. Hayssam said that his brother (Samir) would send the rest of the money the next day. The kidnapping was conducted at the appointed place on March 28th. The kidnappers blocked passage of the victims' car and took hostage Munaf, Marie Jeanne Ion, and the two other journalists.

15. Munaf has appeared at four investigative hearings at CCCI (23 Nov 2005, 19 Jan 2006, 15 Feb 2006, 28 Feb 2006.) Two appearances were made as a witness against the other defendants and two appearances were made as a defendant. Although Munaf remains in the physical custody of MNF-I, the government of Iraq has control over the disposition of Munaf's case because the criminal proceedings before the CCCI already have been initiated.

16. At both sets of investigative hearings, acting as both a witness and a defendant, Munaf positively identified the other kidnappers and admitted to his role in the original kidnap scheme. The Iraqi Judge presiding over Munaf's investigative hearing has determined that sufficient evidence exists to bring Munaf's case to a Trial Panel as a defendant. In addition, Munaf is also involved in another trial as a victim. The Iraqis docketed both trials for September 10, 2006, but they were postponed until September 19, 2006. Munaf will likely be charged with kidnapping and an accomplice to kidnapping at his trial.

17. MNF-I maintains physical custody of detainees while their cases are being heard by the CCCI. They are held as security internees in accordance with UN Security

Council Resolutions 1546 and 1637 until the case is resolved. If they are convicted and sentenced to a term of imprisonment, the Trial Court will issue an Order, which is sent to the Task Force 134. There is no set time frame for when Iraqi Trial Courts formally document convictions. Generally, this occurs within a few days of trial. Once the original formal Trial Court documentation is received and processed, we will issue a subsequent transfer order releasing the detainee to an Iraqi Ministry of Justice facility. Once we formally direct transfer from MNF-I to the Iraqi Ministry of Justice, the normal administrative period for actual transfer, which may be affected by myriad factors, is approximately two to three weeks.

I declare under penalty of perjury that the foregoing is true and correct. Executed on the 15th day of September 2006.

                                        JOHN D. GARDNER
                                        Major General, U.S. Army
                                        Deputy Commanding General
                                        Detainee Operations