IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| MAISOON MOHAMMED, *et. al.*, Petitioners, | ) ) ) ) | C/A NO. 06-1455 (RCL) |
| v. | ) ) |  |
| FRANCIS J. HARVEY, *et. al.*, Respondents. | ) ) ) ) |  |

**REPLY MEMORANDUM IN SUPPORT OF PETITIONERS'
APPLICATION FOR A TEMPORARY RESTRAINING ORDER**

## INTRODUCTION

Respondents maintain that the federal judiciary is powerless to prevent the transfer of Petitioner Mohammad Munaf ("Mr. Munaf") to Iraqi custody, despite the tangible risk of torture, because Mr. Munaf – an American citizen – is in the legal custody of a multinational force. Respondents apparently believe the multinational force has the power to determine the lawfulness of Mr. Munaf's detention, but not an American court. The multinational force can determine the lawfulness of his transfer, but not an American court. As we demonstrate below, Respondents are mistaken. But quite apart from the legal questions, perhaps the most salient fact is that Respondents' arguments are taken almost verbatim from their appellate brief in *Omar v. Harvey*, 416 F. Supp. 2d 19 (D.D.C. 2006), *appeal pending*, where they surfaced after Respondents appealed a preliminary injunction entered by Judge Urbina under identical circumstances. The issues before this Court, therefore, are precisely the issues before the Court of Appeals, which heard argument in *Omar* on September 11, underscoring the wisdom of preserving jurisdiction and the *status quo* here until the appellate court rules.

**ARGUMENT**

As they do in the Court of Appeals, Respondents rest their argument on the twin contentions that this Court lacks habeas jurisdiction over Munaf's custodians because he is in the legal custody of the multinational force in Iraq, and that even if this Court has jurisdiction, granting the temporary restraining order would violate Separation of Powers principles.  Neither argument withstands scrutiny.  We treat them in turn.

**I.    THIS COURT HAS THE POWER TO ENTER A STAND-STILL INJUNCTION THAT PREVENTS THE TRANSFER OF A U.S. CITIZEN TO LIKELY TORTURE BECAUSE HABEAS JURISDICTION EXISTS WHENEVER AND WHEREVER A U.S. CITIZEN IS DETAINED BY AMERICAN FORCES.**

Respondents' jurisdictional argument relies almost entirely on *Hirota v. MacArthur*, 338 U.S. 197 (1949).  For several reasons, *Hirota* does not control this case, as we demonstrate below.  First, however, we pause to discuss the several cases decided *after Hirota* but ignored by Respondents.  Since 1950, the jurisdictional rule has emerged with unmistakable clarity:  the federal courts in this district have the power – indeed, the obligation – to examine the lawfulness of executive detention of a U.S. citizen held by the United States military overseas.  Beginning with *Johnson v. Eisentrager*, 339 U.S. 763 (1950), and continuing through *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), the Supreme Court has repeatedly reaffirmed the power of a district court to act in circumstances like those presented here.  Respondents' argument to the contrary simply cannot withstand the weight of this authority.

The Court in *Eisentrager* reaffirmed the simple but essential principle that U.S. courts have jurisdiction to review the U.S. custody of a U.S. citizen.

> Citizenship as a head of jurisdiction and a ground of protection was old when Paul invoked it in his appeal to Caesar. The years have not destroyed nor diminished the

> importance of citizenship nor have they sapped the vitality
> of a citizen's claims upon his government for protection.

*Eisentrager*, 339 U.S. at 769. While *Eisentrager* concerned habeas jurisdiction over imprisoned enemy aliens, the Solicitor General argued that the federal courts also lacked jurisdiction over the overseas detention of citizens as well. Brief for Petitioner at 14-15, *Johnson v. Eisentrager*, 339 U.S. 763 (1950) (No. 306). The Supreme Court disagreed, stating that jurisdiction lies over citizens' claims of illegal extraterritorial detention.

Two years after *Eisentrager*, the Supreme Court in *Madsen v. Kinsella*, 343 U.S. 341 (1952), revisited the rights of U.S. citizens allegedly implicated in criminal conduct overseas. Yvette Madsen, a U.S. citizen, committed homicide in occupied Germany. She was tried and sentenced by the "United States Court of the Allied High Commission for Germany" established by the "Allied High Command." *Id.* at 343-44, 370. The court that sentenced Madsen was established by General Dwight D. Eisenhower, who acted "as Supreme Commander of the Allied Expeditionary Force." Eli Nobleman, *American Military Government Courts in Germany: Their Role in the Organization of the German People* 44-45 (1950) (citing Combined Directive for Military Government in Germany Prior to Defeat or Surrender, April 28, 1944); *see generally* W. Friedmann, *The Allied Military Government of Germany* 300-03 (1947); *cf. Hirota*, 338 U.S. at 198. The *Madsen* Court was well aware that General Eisenhower established the tribunal at issue under *Allied* authority. *See* 343 U.S. at 370. Nevertheless, it did not dismiss Madsen's petition for lack of habeas jurisdiction, as it would have done if Respondents' reading of *Hirota* were correct. Rather, it addressed the merits of Madsen's argument, tracing authorization for the military tribunal that tried her back to the Articles of War, which "forestalled precisely [Madsen's] contention." *Id.* at 350-51. In so doing, the Court

affirmed habeas jurisdiction even though the Allied High Command was legally distinct from the United States. *Madsen* shows, therefore, that a person can be "in custody" for habeas purposes, even if the relevant legal authority has a multinational character. *Id.* at 354.

Three years after *Madsen*, the Supreme Court in *United States ex rel. Toth v. Quarles*, 350 U.S. 11 (1955), held that a district court had properly issued the writ for a citizen detained for crimes allegedly committed in Korea during U.S. military operations there. *Id.* at 13-15 & n.3. U.S. operations in the Korean conflict, like the operations in Iraq, were authorized by U.N. resolution. *See* Max Hilaire, *United Nations Law and the Security Council* 9, 186 (2005); *cf.* Louis Henkin, *Foreign Affairs and the US Constitution* 255 (2d ed. 1996) (noting America's "unified command" of multinational forces in Korea).[1]  Hence, a U.N. mandate for U.S. military action does not mean that the Constitution ceases to apply, nor does it imply a want of U.S. judicial authority.

Respondents' argument is also fundamentally at odds with *Hamdi*.  Yasser Hamdi, a U.S. citizen, was allegedly captured on an Afghani battlefield during Operation Enduring Freedom, a multinational operation under U.N. Charter auspices. According to the State Department, "Enduring Freedom ... is a *multinational* coalition military operation." U.S. Department of State Office of the Spokesman Fact Sheet, (Jan. 31,

---

[1] U.N. resolutions authorizing force in Korea used language akin to the Iraq resolutions and created a legally distinct multinational command with a large U.S. role. *See* S.C. Res. 84, ¶ 3-5, U.N. Doc. S/RES/84 (July 7, 1950) ("3. *Recommends* that all Members providing military forces and other assistance pursuant to the aforesaid Security Council resolutions make such forces ... available to a unified command under the United States of America; 4. *Requests* the United States to designate the commander of such forces; 5. *Authorizes* the unified command at its discretion to use the United Nations flag in the course of operations against North Korean forces concurrently with the flags of the various nations participating."); *see also* S.C. Res. 83, U.N. Doc. S/RES/83 (June 27, 1950); Hilaire, *supra*, at 11, 242-45.

2006) www.state.gov/r/pa/prs/2006/600083.htm (emphasis added); Brief for Respondents at 2-3, *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) (No. 03-6696) ("U.S. and coalition forces removed the Taliban"). U.S. Ambassador John Negroponte further explained that U.S. forces in Afghanistan acted "in accordance with the inherent right of individual and collective self-defense" granted by Article 51 of the U.N. Charter. Alex Conte, *Security in the 21st Century: The United Nations, Afghanistan and Iraq* 43-44 (2005); *cf.* U.N. Charter art. 51. Subsequently, a U.N. Resolution "authorize[d]" "all necessary measures" to "root out terrorism." S.C. Res. 1386, U.N. Doc. S/RES/1386 (Dec. 20, 2001). The force that detained Mr. Hamdi, like the forces detaining Mr. Munaf, had both a multinational tint *and* a U.N. mandate. Nevertheless, the Supreme Court did not question the district court's jurisdiction over Mr. Hamdi's petition to test the factual and legal basis for his detention.

Even if this clearly applicable precedent were insufficient, Respondents' own submissions demonstrate that the U.S. retains command and legal jurisdiction over Respondents. U.S. forces in Iraq "[obtain authority] to act from United Nations Security Council Resolutions[.]" (Opp. 4). As Respondents go on to show, these resolutions include U.N. Resolution 1546. (Opp. 4). Attached to Resolution 1546 is a letter from Secretary of State Colin Powell stating:

> [T]he MNF must continue to function under a framework that affords the force and its personnel the status they need to accomplish their mission, *and in which the contributing states have responsibility for exercising jurisdiction over their personnel* ....

*See* Exhibit 2 to Respondents' Opposition (emphasis added); *see also* President George W. Bush, "Weekly Radio Address" (Oct. 25, 2003) (transcript available at Lexis News-

All) ("Resolution 1511 … endorses a multinational force in Iraq under U.S. command.").[2]

In summary, international entanglements provide no back door from constitutional scrutiny, and multinational or international "auspices" do not strip federal courts of the power to test the lawfulness of executive detention.

## II.   *HIROTA* DOES NOT DEPRIVE THIS COURT OF JURISDICTION.

Against this authority, Respondents lean heavily on the three-paragraph *per curiam* opinion in *Hirota*.  But as Judge Urbina properly held when he considered the same argument in *Omar*, *Hirota* cannot bear the weight.   *Hirota* concerned a fundamentally different factual situation, arose in a fundamentally different procedural posture, and presented a fundamentally different legal question from the case at bar.  It does not control.  *See Omar*, 416 F. Supp. 2d at 24-27 (lengthy explanation of why *Hirota* is inapplicable).

---

[2] According to Secretary of State Colin Powell, U.N. resolution 1511 simply "gives a chapeau to the multinational force, as it will now be called." Colin Powell, U.S. Sec'y of State, Media Availability Following Passage of Resolution 1511 (Oct. 16, 2003) (transcript available at Lexis News-All); *cf. Hilaire, supra*, at 243 ("Resolution 1511 … does not change the situation on the ground in Iraq … [It] made no major changes in the role of the United Nations."); Thomas D. Grant, *The Security Council and Iraq: An Incremental Practice*, 97 Am. J. Int'l L. 823, 839 (2003) (same).

For all practical purposes, the U.S. controls all coalition forces in Iraq.  *See Fiscal 2006 Appropriations: Hearing Before the Comm. On H. Appropriations Subcomm. On Military Quality of Life and Veterans Affairs*, 108th Cong. (March 3, 2005) (statement of Gen. John P. Abizaid, Commander, U.S. Central Command) (Lexis News-All) ("United States Central Command … remains engaged in three principal activities … Multi-National Forces-Iraq (MNF-I) heads these efforts in Iraq."); *The Imminent Transfer of Sovereignty of Iraq: Testimony Before the H. International Relations Comm.*, 108th Cong. (May 13, 2004) (statement of Lieutenant General Walter L. Sharp, Director, Strategic Plans and Policy The Joint Staff) (Lexis News-All) ("[The MNF] is subordinate to General Abizaid as Commander, US Central Command.").  At minimum, the degree of U.S. control creates a question of jurisdictional fact properly resolved by the District Court.

Hirota and his co-petitioners, senior Japanese officials, were tried and convicted in the Allies' International Military Tribunal for the Far East, and then imprisoned in Tokyo. Five months before Hirota filed his habeas petition, the Supreme Court had held in *Ahrens v. Clark*, 335 U.S. 188, 192 (1948), that federal district courts lacked jurisdiction to issue the Writ for those imprisoned outside their territorial jurisdiction. *See* Motion for Leave to File Pet. for Writ of Habeas Corpus at 36, *Hirota v. MacArthur*, 338 U.S. 197 (1949) (No. 239) (dated November 1948). Hirota and his co-petitioners therefore filed habeas petitions *directly* in the Supreme Court. *See id.* at 1. The Court, noting that "the tribunal sentencing these petitioners is not a tribunal of the United States," held that American courts had "no power or authority to review, to affirm, set aside, or annul the *judgments and sentences* imposed." *Hirota*, 338 U.S. at 198 (emphasis added).

It is at once apparent that *Hirota* bears only a glancing resemblance to this case. As Respondents must concede, *Hirota* held solely that federal courts lacked habeas jurisdiction over foreign nationals "who had been *convicted by an international military tribunal*[.]" (Opp. 13) (emphasis added). The Supreme Court thus focused on whether "judgments and sentences imposed" on the non-citizen *Hirota* petitioners could be disturbed by a U.S. court. *Hirota*, 338 U.S. at 198. Unlike Hirota, Mr. Munaf is an American citizen. As importantly, Mr. Munaf has not been convicted and does not challenge the judgment or sentence of *any* criminal tribunal. While *Hirota* concerned *collateral* review of a *non-citizen's final conviction* in an international tribunal, this case involves *direct* review of *a citizen's indefinite detention without lawful process in U.S. hands*. *Cf. Rasul v. Bush*, 542 U.S. 466, 475-76 (2004) ("six ... facts," including

citizenship and the fact of prior conviction, were relevant to *Eisentrager*'s analysis of statutory jurisdiction). Finally, *Hirota* predates *Eisentrager*, *Madsen*, *Toth*, and *Hamdi*, all of which vindicate the power of the federal judiciary to adjudicate the lawfulness of an American citizen's detention by the U.S. military overseas.

**III.  THE SEPARATION OF POWERS CALLS FOR A JUDICIAL DETERMINATION OF THE LAWFULNESS OF MR. MUNAF'S DETENTION AND THREATENED TRANSFER TO IRAQI CUSTODY.**

   **a.  Because War Is Not A Blank Check, The Separation of Powers Calls Upon The Court To Play An Indispensable Role As A Restraint On Unlawful Executive Detention**

Respondents maintain this Court should stay its hand in deference to the Separation of Powers. But "the allowable limits of military discretion, and whether or not they have been overstepped in a particular case, are judicial questions," and the greatest threat to the principle of divided government comes not when the Court speaks, but when it is silent. *Sterling v. Constantin*, 287 U.S. 378, 401 (1932).

The most important Supreme Court decision in this arena is also the most recent. Regrettably, it is a case given only passing mention by Respondents. In *Hamdi v. Rumsfeld*, the Supreme Court unequivocally rejected a Separation of Powers challenge to the exercise of habeas jurisdiction over a U.S. citizen detained by the U.S. in the course of military operations:

> [I]t does not infringe on the core role of the military for the courts to exercise their own time-honored and constitutionally mandated roles of reviewing and resolving claims like those presented here . . . . "[L]ike other claims conflicting with the asserted constitutional rights of the individual, the military claim must subject itself to the judicial process of having its reasonableness determined and its conflicts with other interests reconciled" . . . . *We have long since made clear that a state of war is not a blank check for the President when it comes to the rights of the Nation's citizens.*

8

542 U.S. at 535-36 (plurality op.) (quoting *Korematsu v. United States*, 323 U.S. 214, 233-34 (1944) (Murphy, J., dissenting)) (internal citations omitted) (emphasis added).

As the Supreme Court held, "unless Congress acts to suspend it, the Great Writ of habeas corpus allows the Judicial Branch to play a necessary role in maintaining th[e] delicate balance of governance, serving as an important judicial check on the Executive's discretion in the realm of detentions." 542 U.S. at 536. Eight Justices in *Hamdi*, following long-standing judicial practice, agreed that a federal court could exercise supervision over military captures of American citizens abroad pursuant to its habeas jurisdiction. *Id.* at 536-37; *id.* at 553 (Souter, J., concurring in part, dissenting in part, and concurring in the judgment); *id.* at 554 (Scalia, J., dissenting); *accord Rasul*, 542 U.S. at 485 ("[If Congress does not suspend the Writ,] the federal courts have jurisdiction to determine the legality of the Executive's potentially indefinite detention of individuals who claim to be wholly innocent of wrongdoing."); *Ex parte Yamashita*, 327 U.S. 1, 9 (1946) (noting that "the Executive branch of the government could not … withdraw from the courts the duty and power to make such inquiry into the authority of the commission as may be made by habeas corpus."); *Ex parte Milligan*, 71 U.S. (4 Wall.) 2, 120-21 (1866). This Court's preservation of habeas jurisdiction via an order enjoining Mr. Munaf's threatened transfer to Iraqi custody is consistent with long-standing and consistently reiterated Separation of Powers principles.[3]

---

[3] Certainly, the executive branch finds no authorization to suspend the Writ in multinational or international consent. While Respondents do not argue that either the United Nations or the multinational force *has* suspended the Writ, therein lies the *de facto* nub of their argument. This argument, which dare not even speak its name, would run afoul of the well-settled principle that no international agreement can abrogate a constitutional provision. *See Reid v. Covert*, 354 U.S. 1, 16 (1957) (plurality opinion)

### b. Habeas Corpus Guarantees Judicial Review of Mr. Munaf's Threatened Transfer to Iraqi Custody.

Nor do the allegations against Mr. Munaf demand judicial silence.[4]  It is well settled that the executive cannot transfer an American citizen to a foreign government, no matter how serious the allegations against him, absent authority from treaty or statute. *See Valentine v. United States*, 299 U.S. 5, 9 (1936) ("[I]n the absence of a conventional or legislative provision, there is no authority vested in any department of the government to seize a fugitive criminal and surrender him to a foreign power."); *Quinn v. Robinson*, 783 F.2d 776, 782 (9th Cir. 1986) ("[N]o branch of the United States government has any authority to surrender an accused to a foreign government except as provided for by statute or treaty."); *Holmes v. Laird*, 459 F.2d 1211, 1219 n. 5 (D.C. Cir. 1972) ("It is certainly the law that the power of the Executive Branch to invade one's personal liberty by handing him over to a foreign government for criminal proceedings must be traced to the provisions of an applicable treaty.").

---

("There is nothing in [the Supremacy Clause] which intimates that that treaties and laws enacted pursuant to them do not have to comply with the provisions of the Constitution."); *De Geofroy v. Riggs*, 133 U.S. 258, 267 (1890) (rejecting the idea that a treaty can "authorize what the Constitution forbids"). Federal officers find no shield from judicial scrutiny in international authorization or multinationalism when they detain an American citizen without lawful process no more than they can hide behind the expedient of moving a prisoner offshore – an evasion *Hamdi* recognized and rejected, *see* 542 U.S. at 524 (plurality op.).

[4] Respondents dress their opposition with a declaration purporting to recount additional allegations against Mr. Munaf.  As a threshold matter, these untested hearsay allegations are irrelevant to the legal questions before this Court, and Respondents make no suggestion otherwise.  Further, as set forth in the attached declaration of Sean Riordan, any incriminating statements Mr. Munaf may have made (which have not been disclosed to counsel) are a product of the very torture he hopes to avoid in Iraq.  *See* Declaration of Sean Riordan ¶¶ 5-10, attached hereto as Exhibit A.

Determining a transfer's lawfulness is a core judicial function, long secured by the habeas statute and Suspension Clause. *See In re Kaine*, 14 F. Cas. 84, 87 (C.C.S.D.N.Y. 1852) (No. 7,598) ("A stipulation in the treaty prohibiting [habeas] jurisdiction [over extradition], equally with a like enactment in a statute, would be void, as in opposition to the constitution."); Gerald Neuman, *Habeas Corpus, Executive Detention, and the Removal of Aliens*, 98 Colum. L. Rev. 961, 995 (1998) (habeas guarantees an "inquiry into detention for the purpose of delivery to a foreign government" to examine its legality).   Federal courts routinely exercise habeas jurisdiction to review decisions to extradite individuals from the United States. *See, e.g.*, *Factor v. Laubenheimer*, 290 U.S. 276, 290-91 (1933) (reviewing whether crime charged is extraditable offense under treaty); *Elias v. Ramirez*, 215 U.S. 398, 409 (1910) (same); *Kaine*, 14 F. Cas. at 87 ("authority of the judiciary to inquire, through a writ of habeas corpus, into the cause of commitment, in case of arrest of fugitives from justice"); Neuman, *supra*, at 994-1004 (detailing history of such review).

Indeed, federal courts review proposed transfers to foreign governments of U.S. citizens detained *overseas*.   One month after *Reid v. Covert* confirmed that habeas jurisdiction protects the substantive constitutional rights of citizens who venture beyond American shores, 354 U.S. 1, 7 (1957) (plurality op.), the Supreme Court exercised habeas jurisdiction over the proposed transfer to Japanese custody of an American serviceman stationed in Japan. *Wilson v. Girard*, 354 U.S. 524, 525-26 (1957) (per curiam).  The Court considered "whether, upon the record before us, the Constitution or legislation …prohibited" Japan's jurisdiction. *Id.* at 530.  The Court thus ensured that there was a sufficient basis in law before validating the transfer. *Accord Holmes*, 459

F.2d at 1218; *cf. INS v. St. Cyr*, 533 U.S. 289, 300 (2001) (denial of judicial review over alien's deportation "would raise serious Constitutional problems"). Thus, just as this Court has jurisdiction to review Mr. Munaf's detention by the United States, it has jurisdiction to review his threatened transfer to Iraq to ensure that it conforms to the Constitution and laws of the United States.

### c. The Rule of Non-Inquiry Does Not Prevent This Court From Inquiring Into the Lawfulness of Mr. Munaf's Threatened Transfer To Iraqi Authorities.

Against this authority, Respondents rely on the rule of non-inquiry. (Opp. 20-25). That rule, however, does not apply to Mr. Munaf's threatened transfer to Iraq. Rather, the rule of non-inquiry cabins the scope of judicial review of transfer in a limited set of circumstances where a treaty specifies the terms and conditions of transfer. Such an agreement "indicates that ... the executive and legislative branches consider the treaty partner's justice system sufficiently fair to justify sending accused persons there for trial." *In re Extradition of Howard*, 996 F.2d 1320, 1329 (1st Cir. 1993). As Respondents must concede, no such treaty exists in this case. On the contrary, the U.N. resolutions Respondents cite do not mention, let alone authorize, transfer from U.S. to Iraqi custody for criminal investigation or prosecution, nor have those resolutions received Senate approval. *Cf.* (Opp.18-19) (arguing TRO would interfere with relationship between MNF-I and Iraq).

The rule of non-inquiry also operates within and depends upon an underlying "legal framework" that "interpose[es] the judiciary between the executive and the individual." *Lo Duca v. United States*, 93 F.3d 1100, 1103 (2d Cir. 1996) (citation and quotation marks omitted). A foreign government seeking extradition of a prisoner in U.S. custody must first submit a formal complaint to a judicial authority. This complaint must

request an arrest warrant and set forth legal and factual grounds for transfer. A federal judge must then determine, upon an evidentiary hearing, whether the alleged offense is extraditable and whether probable cause exists to support the charge. 18 U.S.C. § 3184; *United States v. Kin-Hong*, 110 F.3d 103, 109 (1st Cir. 1997); *Kirkland v. Preston*, 385 F.2d 670, 677 n.19 (D.C. Cir. 1967) (summarizing extradition procedures). The judge issues a certificate of extradition *only* if the warrant meets these requirements. The decision is then subject to habeas corpus review. *Kin-Hong*, 110 F.3d at 107-08.

Here, by contrast, Respondents seek to transfer an American citizen detained for more than fifteen months without meeting any of the requirements outlined above. The rule of non-inquiry plainly does not apply to this case and certainly does not bar a stand-still order preserving the Court's historic habeas jurisdiction.

Further, even assuming that the rule of non-inquiry has any application here, it does not hinder the Court's inquiry into the lawfulness of an American citizen's detention and proposed transfer to foreign custody. In every case Respondents cite, courts reviewed the transfer of an individual to a foreign government to ensure that it complied with the laws and Constitution of the United States. *See, e.g., Neely v. Henkel*, 180 U.S. 109, 121-23 (1901) (reviewing contemplated extradition and concluding transfer was authorized by treaty and consistent with Constitution); *Holmes*, 459 F.2d at 1218 (reviewing contemplated transfer of American servicemen to West Germany following conviction there, and concluding that such transfer was "precise response required of the United States by its treaty commitments"). At most, the rule of non-inquiry affects the *scope* of habeas review over a proposed transfer, not its *availability*. *Cf. Benitez v. Garcia*, 449 F.3d 971, 975-76 (9th Cir. 2006) (granting habeas relief to extradited

prisoner on the basis of limitations in treaty). In *Neely* and *Holmes*, moreover, minimal guarantees of due process were present; nothing suggested the individual's transfer would result in torture. *See Neely*, 180 U.S. at 112; *Holmes*, 459 F.2d at 1213 ("importantly. . . NATO [Status of Forces Agreement] surrounds prosecutions by receiving nations with fair-trial safeguards"); *accord Wilson*, 354 U.S. at 547.

Finally, the rule of non-inquiry notwithstanding, executive authority to transfer an American citizen to a foreign power necessarily remains subject to the Constitution. *See Edwards v. Carter*, 580 F.2d 1055, 1058 (D.C. Cir. 1978) ("[T]he treaty power can only be exercised in a manner which conforms to the Constitution . . . ."); *accord Reid*, 354 U.S. at 16-17; *De Geofroy v. Riggs*, 133 U.S. 258, 267 (1890); *Plaster v. United States*, 720 F.2d 340, 348 (4th Cir. 1983) ("[I]n carrying out its treaty obligations, [the United States must] conform its conduct to the requirements of the Constitution.").

A citizen's right to be free from torture is fundamental. *See Palko v. Connecticut*, 302 U.S. 319, 326 (1937), *overruled on other grounds by Benton v. Maryland*, 395 U.S. 784 (1979); *see also Gregg v. Georgia*, 428 U.S. 153, 169-70 (1976); *Ashcraft v. Tennessee*, 322 U.S. 143, 155 (1944). The prohibition against torture and other abuse embodied in the Fifth Amendment's Due Process guarantee categorically prohibits treatment that "shocks the conscience." *Rochin v. California*, 342 U.S. 165, 172-73 (1952); *Harbury v. Deutch*, 233 F.3d 596, 602 (D.C. Cir. 2000), *rev'd on other grounds*, 536 U.S. 403 (2002).

An American citizen's right to be free of torture means the U.S. cannot render him to a foreign power for torture without violating the Fifth Amendment's Due Process Clause. *Cf. Rosado v. Civiletti*, 621 F.2d 1179, 1195-96 (2d Cir. 1980) (extradition

cannot "expose [American citizen] to procedures or punishment 'antipathetic to a federal court's sense of decency'") (quoting *Gallina v. Fraser*, 278 F.2d 77, 79 (2d Cir. 1960)); *Kin Hong*, 110 F.3d at 112 (extradition cannot "shoc[k] the conscience"); *In re Burt*, 737 F.2d 1477, 1487 (7th Cir. 1984) (reviewing extradition to ensure "standards of fair play and decency"). Indeed, federal courts have jurisdiction to prevent non-citizens' transfer from the United States to foreign governments when it would place them at risk of torture. *See, e.g.*, *Toure v. Attorney General of the U.S.*, 443 F.3d 310 (3d Cir. 2006). An American citizen detained by the United States is entitled to no less protection.

In sum, while it may be settled that the Constitution grants no "immunity" to commit crimes in another country and no right to the same "modes of trial" as in the United States, *Neely*, 180 U.S. at 123, it is also settled that the Constitution contains no untrammeled executive power to transfer an American citizen for likely torture without judicial review. The Constitution forbids that result, even as it permits transfers that accord with the law and constitutional rights.

### d. The Political Question Doctrine Does Not Strip Courts Of Habeas Jurisdiction.

Lacking support in precedent, Respondents invoke the "political question" doctrine to bar review. (Opp. 25). Their political question argument, however, largely repeats their mistaken separation-of-powers argument. *Cf. Baker v. Carr*, 369 U.S. 186, 210 (1962) (political questions are "primarily a function of the separation of powers"); *Abu Ali v. Ashcroft*, 350 F. Supp 2d 28, 64 (D.D.C. 2004) ("The [political question] argument respondents raise is essentially the same as their separation of powers argument, and it is met with the same answer."). Indeed, there has never been a case in

which a federal court has considered the lawfulness of executive detention of a U.S. citizen as anything other than a judicial question.

The D.C. Circuit recently confirmed that "claims based on 'the most fundamental liberty and property rights of this country's citizenry,' such as the Takings and Due Process Clauses of the Fifth Amendment, are 'justiciable, even if they implicate foreign policy decisions.'" *Bancoult v. McNamara*, 445 F.3d 427, 435 (D.C. Cir. 2006) (quoting *Committee of U.S. Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 935 (D.C. Cir. 1988));[5] 13A Charles Wright et al., *Federal Practice and Procedure* § 3534.2, at 504 (2d ed. 1984) ("[T]he pervasive influence of political question doctrine in fields touching on foreign affairs has not led courts to surrender their power to protect individuals against government action."); *Abu Ali*, 350 F. Supp 2d at 64 (same). When respondents seek radical restructuring of the separation of powers, courts "have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given." *Cohens v. Virginia,* 19 U.S. (6 Wheat.) 264, 404 (1821).

Moreover, the Court in *Hamdi* rejected exactly the same separation-of-powers argument Respondents make here based on military and foreign affairs powers. (Opp. 26). The *Hamdi* Court "necessarily reject[ed] the Government's assertion that separation of powers principles mandate a heavily circumscribed role for the courts," even when American citizens are detained during combat. 542 U.S. at 535; *see also id.* at 553 (Souter, J., concurring in part, dissenting in part, and concurring in the judgment). "Whatever power the United States Constitution envisions for the Executive in its exchanges with other nations or with enemy organizations in times of conflict, it most

---

[5] Respondents rely on *Bancoult* – but omit this directly relevant statement.

assuredly envisions a role for all three branches when individual liberties are at stake." *Id.* at 536 (plurality op.); *accord Mistretta v. United States*, 488 U.S. 361, 380 (1989); *Abu Ali*, 350 F. Supp. 2d at 55 (political question doctrine does not eliminate petitioner's challenge to lawfulness of his detention).

## IV.    TRANSFER TO IRAQI CUSTODY IS NOT THE SAME AS THE RELEASE TO FREEDOM.

Finally, Respondents erroneously suggest that the Court will exceed its legal authority and principles of habeas corpus by enjoining a transfer that would result in Mr. Munaf's no longer being in American custody. Transfer to Iraqi custody, Respondents propose, is the factual and legal analog of release. (Opp. 29).

Again, Respondents are mistaken. The Court will not "grant all of the relief Munaf might get pursuant to a habeas petition" by preventing his middle-of-the-night transfer to Iraqi custody. (Opp. 29). Respondents conflate two concepts that are fundamentally distinct in fact and in law: release to freedom, on the one hand, and transfer to another custodian for continued detention and torture, on the other. Certainly, no district court would enjoin a habeas petitioner's *release* from prison to freedom. Yet, a court most certainly may enjoin a prisoner's illegal transfer to another custodian, including a foreign government. Indeed, for centuries, habeas has been used to bar transfers to preserve the court's jurisdiction. *See, e.g.*, Habeas Corpus Act of 1679, 31 Car. 2, c.2, § 12 (outlawing transfer of prisoners beyond court's jurisdiction to protect habeas review).

To be sure, it remains the case that Iraqi authorities might arrest and detain Mr. Munaf for criminal prosecution if the U.S. releases him and he remains in Iraq. (Opp. 30). This possibility of future detention by another sovereign exists in every habeas

proceeding. But whether that comes to pass is pure speculation. More to the point, it is irrelevant to whether Respondents are conducting themselves lawfully when they detain or transfer Mr. Munaf. In all events, the law is not blind to the common-sense distinction between transfer to torture and release to freedom: "[E]ven a dog distinguishes between being stumbled over and being kicked." O.W. Holmes, *The Common Law* 3 (1881). Respondents cannot leverage the possibility of a future arrest to strip the District Court of habeas corpus jurisdiction to review the legality of Mr. Munaf's fifteen-month detention and proposed transfer to Iraqi custody.

## CONCLUSION

For the foregoing reasons, this Court should grant Petitioners' application for a temporary restraining order barring Mr. Munaf's transfer to Iraqi custody and preserving the *status quo* pending resolution of his habeas corpus petition.

Dated: September 20, 2006

Respectfully submitted,


_____/s/ Jonathan Hafetz_____
Jonathan Hafetz (*admitted pro hac vice*)
Aziz Z. Huq (*admitted pro hac vice*)
BRENNAN CENTER FOR JUSTICE AT
NEW YORK UNIVERSITY LAW
SCHOOL
161 Avenue of the Americas
12th Floor
New York, NY 10013
Telephone:    (212) 998-6730
Facsimile:    (212) 995-4550

Joseph Margulies
MACARTHUR JUSTICE CENTER,
NORTHWESTERN UNIVERSITY
SCHOOL OF LAW
357 East Chicago Avenue
Chicago, IL 60201
Telephone:    (312) 503-0890

Susan L. Burke (D.C. Bar # 414939)
BURKE PYLE LLC
4112 Station Street
Philadelphia, PA 19127
Telephone:    (215) 487-6596
Facsimile:    (215) 482-0874