**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **MAISOON MOHAMMED**, *et al.*, ) | |
| ) | |
| **Petitioners,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 06-1455 (RCL)** |
| ) | |
| **FRANCIS J. HARVEY**, *et al.*, ) | |
| ) | |
| **Respondents.** ) | |
| ) | |

**MEMORANDUM OPINION**

This matter comes before the Court on a motion[6] and supplemental motion [12] for temporary restraining order seeking injunctive relief pending the Court's review of a petition for writ of habeas corpus. [1] Upon consideration of the petition, the memorandum in support of the motion for temporary restraining order, the opposition and the reply thereto, the applicable law, the entire record herein, and after hearing argument, the Court dismisses the petition *sua sponte* for lack of subject matter jurisdiction. As such, the Court also dismisses the motion for temporary restraining order as moot. The Court's reasoning is set forth below.

I. **BACKGROUND**

The petitioner, Mohammad Munaf,[1] was born in Iraq in 1952 and became a United States citizen in 2000. Mohammed Decl. ¶¶ 2, 4, 7.[2] He is married to a Romanian woman, split

---

[1] The petition in this case was brought on behalf of Munaf by his sister, Maisoon Mohammed, as next friend. For ease of reference, the Court will use the singular "petitioner" to refer to Munaf.

[2] Ms. Mohammed's affidavit consists partly of matters within her personal knowledge and partly of hearsay statements. Petitioner also submits three declarations of Sean Riordan, a law

residences between Romania and the United States from 1996 to 2001, and since 2001 has lived

solely in Romania. *Id*. ¶¶ 5, 6, 9. In March 2005 he traveled from Romania to Iraq with several

Romanian journalists. *Id*. ¶ 10. Shortly after their arrival, the group was kidnapped and held

captive for almost two months by a group claiming to be the "Muadh Ibn Jabal Brigade." *Id*. ¶¶

11-13. Their release was secured in May 2005 during a raid by military troops under the

command of Multi-National Force-Iraq ("MNF-I"). Gardner Decl. ¶¶ 3-4.

MNF-I is a military force described as "a coalition authority consisting of approximately

twenty-seven different nations that operates in accordance with the mandate of United Nations

Security Council Resolutions (UNSCR) 1546 and 1637 (2005)." Gardner Decl. ¶ 2; *see also*

Respondents' Opposition to Petitioners' Motion for a Temporary Restraining Order [9-1]

("Opp."), Ex. 2 (Resolution 1546), Ex. 3 (Resolution 1637). Under this limited mandate, which

is set to expire at the end of 2006 unless renewed, MNF-I operates "on behalf of and at the

request of the Iraqi government" in Iraq. Gardner Decl. ¶ 2. MNF-I's power under the U.N.

Resolutions includes the authority to detain prisoners who pose a threat to security in Iraq.

MNF-I and the government of Iraq have agreed that MNF-I will maintain physical custody of

prisoners awaiting criminal prosecution in Iraqi courts, as Iraq lacks much of the infrastructure

necessary for maintaining its own prisoners. *Id.* ¶¶ 2-3; Opp. at 4.

Since the MNF-I raid, petitioner Munaf has been held as a prisoner by MNF-I troops at

---

student and legal intern for petitioner's American legal counsel, who speaks Arabic. These
declarations consist of Riordan's accounts of his conversations, in Arabic, with one of
petitioner's sisters, *see* First Riordan Decl. and Third Riordan Decl., and with petitioner's Iraqi
lawyer, *see* Second Riordan Decl., both of whom are in Iraq. Portions of these declarations
contain additional layers of hearsay. At this stage of the proceedings, the Court will consider all
of the materials before it.

Camp Cropper, a military installation located at the Baghdad International Airport.  Petition ¶ 3.

It has been alleged that petitioner was a willing participant in a kidnapping-for-profit scheme, in

that he posed as a kidnap victim and led the actual victims into a trap.[3]  Gardner Decl. ¶¶ 4-5, 11-

14.  Petitioner maintains he is innocent of any criminal wrongdoing, and that he is not and has

never been a member of al Qaeda in Iraq or any other terrorist group.  Petition ¶ 22.

Petitioner alleges that for the first five months of his detention, he was held

incommunicado.  Petition ¶ 4.  Since then, he has had limited contact with his family and with an

Iraqi attorney.  *Id*.  Two months after petitioner was taken into custody, he appeared before a

three-person panel of MNF-I officers who conducted "a comprehensive review of Munaf's status

and detention."  Opp. at 7; Gardner Decl. ¶ 5.  The panel interviewed witnesses and reviewed

"available intelligence information."  Gardner Decl. ¶ 5.  Petitioner was present at the hearing

and had an opportunity to hear the basis for his detention and to make a statement.  *Id*.  The panel

found that petitioner should be considered a "security internee," as defined in U.N. documents,

and should continue to be detained pursuant to MNF-I's U.N. mandate.  *Id*.

Munaf's case was referred to the Iraqi government.  Gardner Decl. ¶ 6.  The government

instituted criminal proceedings in the Central Criminal Court of Iraq ("CCCI"), an Iraqi court

that is staffed by Iraqi citizens and applies Iraqi law.  *Id*. ¶ 7.  Munaf has appeared at four CCCI

"Investigative Hearings," each time with his Iraqi attorney.  *Id*. ¶ 15.  At two of these hearings

---

[3]According to respondents, petitioner's role in the scheme was to travel to Iraq with the journalists, "ostensibly as their guide and translator and help facilitate the kidnapping."  Gardner Decl. ¶ 13.  The alleged "mastermind" of the plot would then negotiate the release of the Romanians, which would "increase his own stature" and help him "gain the support of the Romanian President Traian Basescu to develop new business in Romania."  *Id.* ¶¶ 11-12.  The kidnappers called themselves the "Muadh Ibn Jabal Brigade" and demanded payment of a ransom and that Romania withdraw its troops from Iraq.  Mohammed Decl. ¶ 12.

Munaf appeared as a witness against other defendants, and at the other two he appeared as the

defendant in his own prosecution.  *Id.*  The Investigative Hearing Judge concluded that there was

sufficient evidence to refer Munaf's case to the Trial Court as a defendant.  *Id.*  Respondents

allege that Munaf has confessed his role in the kidnapping on camera, in writing, and in front of

the Investigative Hearing Judge.  Gardner Decl. ¶ 11.  Munaf counters that any incriminating

statements he made were coerced.  First Riordan Decl. ¶¶ 8, 11.  Specifically, petitioner alleges

that he has been threatened by "U.S. and Romanian officials," and that unspecified "[o]fficials"

told him that if he did not confess, he, his sister, and his wife would be sexually assaulted.  *Id.*

Through his sister as next friend, Munaf petitioned in this Court for a writ of habeas

corpus on August 18, 2006.  The petition named as respondents Francis J. Harvey, the United

States Secretary of the Army; Maj. Gen. William H. Brandenburg, Deputy Commanding General

of Detainee Operations for Task Force 134, MNF-I; and one "Colonel Steele," first name

unknown, who is the alleged Commanding Officer of Camp Cropper.  The petition calls for

issuance of a writ compelling respondents to allow Munaf access to attorneys of his choice, to

"establish a lawful basis for Mr. Munaf's detention or release him from custody," and to enjoin

his transfer to Iraq authorities.  On September 8, 2006, petitioner moved for a temporary

restraining order to prohibit respondents from transferring him to the custody of the government

of Iraq, pending resolution of his habeas petition.  A hearing on the motion was held on October

10, 2006.

On October 12, 2006, petitioner and his five codefendants appeared before a three-judge

Trial Panel of the CCCI to face kidnapping charges under the Iraqi Penal Code.  Pirone Decl. ¶ 3.

Petitioner was accompanied by his Iraqi counsel and had the opportunity to "submit any evidence

or bring any witnesses." *Id.* ¶4. Indeed, petitioner did make a statement, reiterating his position that he was innocent and that his prior confession was coerced. Second Riordan Decl. ¶ 9. Petitioner claims that two "United States military officials" attended the hearing. *Id.* ¶ 7. He alleges that one was an American soldier who told the court he was appearing at the request of the Romanian embassy to seek the death penalty for the defendants. *Id.* Petitioner alleges that the other was an American general "who told the judge in open court that the defendants should all be convicted and sentenced to death," and that one "Judge Al-Rubaay" disagreed with the general.[4] *Id.* at ¶¶ 7-8. At one point, defendants and their counsel were removed from the courtroom. Petitioner claims that the "American military officials" then met with the judge for about 15 minutes. *Id.* ¶ 12.

Respondents explain that Robert Pirone, a Coast Guard Lieutenant who serves as an attorney at the CCCI Liaison Office in Baghdad, was present at the hearing in his capacity as a participant in MNF-I. Pirone Decl. ¶ 1. According to Pirone's sworn affidavit, Pirone appeared at the trial to make a formal complaint for the Romanian government about the kidnapping, whose victims were all Romanian.[5] *Id.* ¶ 7. Pirone was under oath at the trial, and his notarized authorization to represent the Romanian Embassy had been submitted to the court weeks before the trial. *Id.* In his affidavit, Pirone attests that his role at the trial was limited to answering questions about the case, based on prior confessions by the defendants, and to making the formal

---

[4] While petitioner mentions only one judge who was present at the hearing, respondents have identified three judges who were present. *See* Second Riordan Decl. ¶ 5; Pirone Decl. ¶ 3. The use of a three-judge panel is consistent with the Trial Panel procedure previously described by respondents. Gardner Decl. ¶ 9.

[5] Romania participates in MNF-I. Opp. at 3 n.1.

complaint, a requirement under Iraqi law.  *Id.*  Petitioner and his codefendants were allowed to make statements, and counsel for the prosecution and defendants made arguments.[6]  Second Riordan Decl. ¶¶ 9-10; Pirone Decl. ¶¶ 6-9.  The Trial Panel questioned the defendants and called additional witnesses.  Pirone Decl. ¶¶ 6-7.

Pirone attests that no other member of MNF-I participated in the trial in any way, and that any MNF-I personnel who were present were there only as observers or guards.  *Id.* ¶ 8.  There was no American general present, nor a general of any other MNF-I member nation.  *Id.*  Pirone states that when the courtroom was closed, he left the room and spent the entire recess talking with petitioner's attorney.  *Id.* ¶ 10.  He also says that no MNF-I personnel were with the judges while they deliberated.  *Id.*  When the hearing was reconvened, the court found petitioner and his five codefendants[7] guilty of kidnapping and sentenced them all to death.

A standard practice is followed when an MNF-I detainee is convicted of criminal charges by the CCCI.  Gardner Decl. ¶ 17.  First, the Trial Court issues an order to the Deputy Commanding General for Detainee Operations of MNF-I, who is a respondent in this case.[8]  *Id.*  In response, the Deputy Commanding General for Detainee Operations issues a transfer order releasing the detainee to an Iraqi Ministry of Justice facility.  *Id.*  It typically takes two to three

---

[6]Petitioner and four of his codefendants recanted their prior confessions before the Trial Panel, claiming they had been coerced.  Second Riordan Decl. ¶ 9; Pirone Decl. ¶ 6.

[7]Munaf's codefendants were held in the custody of the Iraqi government and were never in the custody of MNF-I.  Pirone Decl. ¶ 4.

[8]The habeas petition names as a respondent one "Major General William H. Brandenburg, Deputy Commanding General (Detainee Operations)/Commanding General, Task Force 134, Multi-National Force-Iraq."  Respondents have identified the proper respondent as Major General John D. Gardner in his capacity as the "Deputy Commanding General for Detainee Operations (DCG-DO) Multi-National Force-Iraq."  Gardner Decl. ¶ 1.

weeks to process a transfer.  *Id.*  A defendant under sentence of death in Iraq has a statutory right

to an automatic appeal to the Iraqi Court of Cassation.  Pirone Decl. ¶ 13.  The defendant has 30

days from the day after sentencing to submit material to the Court of Cassation.  *Id.*


**II.    ANALYSIS**

**A.    Standard for Reviewing Habeas Corpus Petition for Jurisdiction**

"Whenever it appears by suggestion of the parties or otherwise that the court lacks

jurisdiction of the subject matter, the court shall dismiss the action."  Fed. R. Civ. P. 12(h)(3).  If

a court determines that it lacks subject matter jurisdiction, it therefore is duty bound to dismiss

the case on its own motion.  In considering the legal sufficiency of the jurisdictional allegations

in a petition for habeas corpus, the Court takes the petitioners' factual allegations as true,

drawing all reasonable inferences in the petitioners' favor.  *See Hawk v. Olson*, 326 U.S. 271,

272 (1945); *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 39 (D.C. Cir. 2000).

But in determining its own jurisdiction, the Court is not limited to the allegations in the petition.

*See Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482

U.S. 64 (1987).  The Court may examine materials outside the pleadings as appropriate to

determine whether it has jurisdiction over the subject matter.  *See Herbert v. Nat'l Acad. of

Sciences*, 974 F.2d 192, 197 (D.C. Cir. 1992).

Petitioner alleges that a "U.S. citizen detained in the custody of federal officials in

violation of the Constitution, laws, or treaties of the U.S. unquestionably has the right to

challenge that detention in federal court once personal jurisdiction over the petitioner's custodian

is established." Petition ¶ 8. He alleges that he "is detained by U.S. officials at a detention

facility known as Camp Cropper. The facility is under the control of the U.S. military and within

the plenary and exclusive jurisdiction or dominion exercised in fact of the U.S." *Id.* ¶ 9. He

contends that he is "in U.S. custody." *Id*. ¶ 21. Respondents counter that "[a]lthough United

States Armed Forces participate in the detention [of detainees pending CCCI prosecutions], they

do so not *qua* the United States but as part of their role in MNF-I." Opp. at 8.

**B.      Habeas Corpus Jurisdiction**

"Federal courts are courts of limited jurisdiction. They possess only that power

authorized by Constitution and statute, which is not to be expanded by judicial decree. It is to be

presumed that a cause lies outside this limited jurisdiction[.]" *Kokkonen v. Guardian Life Ins.*

*Co. of America*, 511 U.S. 375, 377 (1994). The principal source of jurisdiction alleged in this

case is the habeas corpus statute applicable to the federal government, 28 U.S.C. § 2241 (2006).

In pertinent part, it states that the:

> writ of habeas corpus shall not extend to a prisoner unless–
>
> (1) He is in custody under or by color of the authority of the United States or is
> committed for trial before some court thereof; or
> (2) He is in custody for an act done or omitted in pursuance of an Act of Congress, or an
> order, process, judgment or decree of a court or judge of the United States; or
> (3) He is in custody in violation of the Constitution or laws or treaties of the United
> States; or
> (4) He, being a citizen of a foreign state and domiciled therein is in custody for an act
> done or omitted under any alleged right, title, authority, privilege, protection, or
> exemption claimed under the commission, order or sanction of any foreign state, or under
> color thereof, the validity and effect of which depend upon the law of nations; or
> (5) it is necessary to bring him into court to testify or for trial.

28 U.S.C. § 2241(c). The application for the writ must "allege the facts concerning the

applicant's commitment or detention, the name of the person who has custody over him and by

virtue of what claim or authority, if known." *Id.* at § 2242. If the writ is granted, it "shall be directed to the person having custody of the person detained," who can therefore "be required to produce at the hearing the body of the person detained." *Id.* at § 2243.

Under these terms, "[t]he turnkey of the habeas statute is the requirement of custody." *Abu Ali v. Ashcroft*, 350 F.Supp. 2d 28, 45 (D.D.C. 2004). A court has jurisdiction to issue the writ only if the petitioner is "in custody under or by color of the authority of the United States" or "in violation of the Constitution or laws or treaties of the United States," or other elements not relevant here. A central prerequisite for habeas relief is that the court must have the ability to force compliance by the petitioner's custodian, because "[t]he writ of habeas corpus does not act upon the prisoner who seeks relief, but upon the person who holds him in what is alleged to be unlawful custody." *Braden v. 30th Judicial Circuit Court of Kentucky*, 410 U.S. 484 (1973). The identity of the custodian is crucial because the writ:

> is directed to, and served upon, not the person confined, but his jailor. It does not reach the former except through the latter. The officer or person who serves it does not unbar the prison doors, and set the prisoner free, but the court relieves him by compelling the oppressor to release his constraint. The whole force of the writ is spent upon the respondent, and if he fails to obey it, the means to be resorted to for the purposes of compulsion are fine and imprisonment.

*In the Matter of Samuel W. Jackson*, 15 Mich. 417, 439-40 (1867).

The Supreme Court has "very liberally construed the 'in custody' requirement for purposes of federal habeas." *Maleng v. Cook*, 490 U.S. 488, 492 (1989). For habeas jurisdiction to exist, the prisoner must be "held in actual or constructive custody by the respondents named in the petition, or by any other person or persons subject to the jurisdiction of the District Court." *United States ex rel. Keefe v. Dulles*, 222 F.2d 390, 392 (D.C. Cir. 1954). The converse must

also be true: if the petitioner is in custody under some authority other than the United States, there is no habeas jurisdiction. For instance, where a U.S. citizen was held in a French jail by the authority of a French court, a U.S. court did not have jurisdiction over his habeas petition. *Id.* at 391 ("For obvious reasons, [petitioner] did not ask that the writ be directed to the foreign jailer.").

A prisoner is in the constructive custody of the United States when he is in the actual, physical custody of some person or entity who cannot be deemed the United States, but is being held under the authority of the United States or on its behalf. Constructive custody has been found in cases of actual custody between one state and another, *Braden v. 30th Judicial Circuit Court of Kentucky*, 410 U.S. 484 (1973) (prisoner in actual custody of state of Alabama found to be in constructive custody of Kentucky for habeas purposes); between a state and a private prison, *Stokes v. United States Parole Comm'n*, 374 F.3d 1234, 1238 (D.C. Cir. 2004), *Skelton v. Pri-Cor, Inc.*, 963 F.2d 100, 102 (6th Cir. 1991); between the United States and private individuals acting as its agent, *United States v. Jung Ah Lung*, 124 U.S. 621, 626 (1888) (petitioner held by harbormaster "in custody by direction of the customs authority of the port, under the provision of the Chinese restriction act," an act of Congress), *Chin Yow v. United States*, 208 U.S. 8 (1908) (petitioner held by manager of steamship company under similar authority); and between the United States and a foreign country that is used as the United States' "intermediary," *Abu Ali v. Ashcroft*, 350 F.Supp. 2d 28 (D.D.C. 2004).

The reach of the writ is not limited to the territorial jurisdiction of the United States courts where the immediate custodian is the United States. *See, e.g., Burns v. Wilson*, 346 U.S. 137 (1953) (finding jurisdiction over habeas claims by airmen detained under courts martial in

10

Guam); *United States ex rel. Toth v. Quarles*, 350 U.S. 11 (1955) (finding jurisdiction over habeas petition by ex-airman facing court martial in Korea). The ultimate territorial scope of the writ remains an open question.

That question need not be answered in this case, because petitioner fails on a threshold requirement: he is not being held "under or by color of the authority of the United States" or "in violation of the Constitution or laws or treaties of the United States," as required under the habeas statute. Petitioner has alleged that he is "detained by U.S. officials" and "in U.S. custody." Petition ¶¶ 9, 21. But he is in the custody of coalition troops operating under the aegis of MNF-I, who derive their ultimate authority from the United Nations and the MNF-I member nations acting jointly, not from the United States acting alone. The United States has not asserted and does not profess to have the independent right to order that petitioner be moved, tried, punished, or released. Petitioner is thus under the actual, physical custody of MNF-I, a multinational entity separate and distinct from the United States or its army. He is in the constructive custody of the Republic of Iraq, which is seized of jurisdiction in the criminal case against him, and which controls his ultimate disposition. Petitioner thus has two custodians, one actual and the other constructive: MNF-I and the government of Iraq. Petitioner has not shown that either custodian is the equivalent of the United States for the purposes of habeas corpus jurisdiction.

### 1.     Iraq as Custodian

Petitioner voluntarily entered the sovereign country of Iraq and has been convicted by the courts of that country for a violation of Iraqi law. The writ of habeas corpus will not reach to a foreign sovereign. *See, e.g., Duchow v. United States*, 1995 WL 425037 *1, *3, 95-cv-2121

11

(E.D. La. 1995) (U.S. citizen detained in Bolivia by Bolivian government not entitled to habeas relief). *See generally Ex parte Mwenya*, [1960] 1 Q.B. 241 (summarizing evolution of British common law of habeas corpus, in which availability of the writ turns on the sovereign's control over the custodian). In exceptional cases where the United States acts through another country as an intermediary to hold a U.S. citizen, at the direction and under the ultimate control of the United States, the writ can be issued to the appropriate officials of the United States. *Abu Ali*, 350 F.Supp. 2d 28. But no evidence has been presented that the sovereign nation of Iraq is holding petitioner at the direction and under the ultimate control of the United States.

### 2. MNF-I as Custodian

It does not change the outcome to point out that Munaf is in the physical custody of U.S. troops in their capacity as participants in MNF-I. Where a U.S. citizen is detained under the authority of a multinational military entity, he is not in custody "under or by color of the authority of the United States," even if American military personnel play a role in his detention as part of their participation in that multinational force. Petitioner in this case is held by MNF-I, operating under international authority derived from the U.N. Resolutions. MNF-I has clearly asserted its authority over him by, for instance, conducting a hearing at which MNF-I determined that petitioner should be held as a security internee and that his case should be referred to CCCI.

In *Hirota v. General of the Army MacArthur*, 338 U.S. 197 (1948) (per curiam), Japanese citizens moved in the Supreme Court for leave to file habeas corpus petitions challenging their sentences under a military tribunal in Japan. American military personnel participated in the tribunal, and the prisoners were in the physical custody of U.S. troops. General Douglas MacArthur, acting in his capacity as Supreme Commander for the Allied Powers, established the

military tribunal "as the agent of the Allied Powers." *Id.* at 198. The Court denied the

petitioners' motion because "the tribunal sentencing these petitioners is not a tribunal of the

United States." *Id.* The Court traced the authority under which the tribunal acted and

determined that it emanated from the multinational Allies and not the United States in its

independent capacity. Because the prisoners were held under the authority of an entity that was

"not a tribunal of the United States," the prisoners were not in the custody of the United States

for purposes of habeas jurisdiction.

The rule recognized in *Hirota* was applied in *Flick v. Johnson*, 174 F.2d 983 (D.C. Cir.

1949), in which German citizens petitioned for habeas corpus to challenge their convictions by

an Allied military tribunal in Germany following World War II. While the tribunal had been

staffed by Americans and the petitioners were in the physical custody of American soldiers, the

crucial question was the authority by which they were held: "If it was an international tribunal,

that ends the matter." *Id.* at 985. Because the tribunal derived its authority from the Allies acting

jointly in the immediate aftermath of the fall of Germany, it was not "a tribunal of the United

States." Therefore "no court of this country has power or authority to review, affirm, set aside or

annul the judgment and sentence imposed." *Id.* at 984.

Petitioner counters that the habeas applicants in those cases were not U.S. citizens. But

nothing in *Hirota* or *Flick* purported to turn on whether the petitioners were citizens. The courts

were without jurisdiction because the petitioners were held under the authority of entities that

were "not a tribunal of the United States." The identity of the custodian, and the concomitant

lack of habeas jurisdiction, would remain the same regardless of the petitioners' citizenship.

This is because, as stated previously, the writ acts upon the custodian, not the prisoner.

The fact that it is the identity of the custodian that matters most in this context, and not the citizenship of the prisoner, is demonstrated by *In re Yamashita*, 327 U.S. 1 (1946). There a Japanese commander petitioned for habeas corpus to challenge his sentence by a military tribunal in the Philippines. The Supreme Court traced the authority under which the tribunal was established: the authority emanated originally from the President of the United States as commander-in-chief, who directed the Joint Chiefs of Staff, who in turn commanded General MacArthur, acting in his capacity as "Commander in Chief, United States Arm Forces, Pacific," who in turn specifically ordered a U.S. Army general to establish the tribunal. *Id.* at 10. The tribunal derived its power entirely from the United States Executive and operated outside the framework of the Allied Powers. The Court found that there was habeas jurisdiction for a limited inquiry into the jurisdiction of the sentencing tribunal.

*Hirota* and *Yamashita*, taken together, recognized that General MacArthur acted in two capacities, as both an American and Allied commander, and evaluated the derivation of authority by which he and his subordinates held prisoners in custody. Therefore, prisoners who were in custody of the United States alone, under the sole authority of the United States, could invoke habeas jurisdiction.[9] But prisoners who were held pursuant to the authority of the Allies, and who were in the physical custody of American soldiers acting as members of the Allied Powers, were in the custody of the Allies, not the United States, and therefore could not invoke the

---

[9]Courts have found jurisdiction to entertain habeas petitions from U.S. military personnel who were held or tried by American military tribunals or courts martial in various locations the world over. The jurisdiction has turned not on the location where the soldier was held, nor on the composition of the force in which he served – multinational or unilateral – but on the authority under which he was actually tried or held. *See, e.g., Burns v. Wilson*, 346 U.S. 137 (1953) (courts had jurisdiction over habeas claims of airmen tried by U.S. courts martial in Guam).

jurisdiction of the U.S. courts. *Flick* and *Madsen v. Kinsella*, 343 U.S. 341 (1952) are to the same effect for the European theater.

Petitioner claims that citizenship must have mattered in *Hirota* and *Flick* because there have been other cases where courts entertained habeas applications from citizens who were in the custody of the United States while it participated in a multinational force. But in each of these cases, the petitioner was held under the independent authority of the United States *qua* United States, not by a multinational force in which the United States participated. In all of those cases, the courts traced the authority of the custodian to its source to determine if the custodian was the United States or some other entity.

For instance, petitioner cites to *Madsen v. Kinsella*, 343 U.S. 341 (1952). In that case the Supreme Court found that there was jurisdiction to hear the habeas petition of a woman confined in a federal prison in West Virginia for the murder of her serviceman-husband, whom she had killed in the American Occupied Zone of Germany shortly after World War II. She had been tried and sentenced in Germany by the "United States Court of the Allied High Commission for Germany" in 1950. This court, established unilaterally by the United States and with jurisdiction within the American zone of control, was a different court than the one at issue in *Flick*. It was a purely American creation and did not purport to exercise the authority of the Allies, and, moreover, petitioner was in custody in a United States federal prison in America.

Similarly, habeas jurisdiction was found to lie in the case of a former U.S. airman who was arrested by military officials in America and taken to Korea, where he was charged in a court martial with participating in a murder conspiracy in Korea during the Korean conflict. *United State ex rel. Toth v. Quarles*, 350 U.S. 11 (1955). Though America had participated in the

Korean conflict under the auspices of a multinational United Nations force, the petitioner's court martial was an entirely American tribunal, established under the authority of an act of Congress.[10] Once again, the Court established at the outset that the tribunal derived its authority solely from the United States government. With the United States as custodian, habeas jurisdiction was proper, despite the fact that the prisoner and immediate custodian were in Korea.

Petitioner has argued that strong dicta in *Johnson v. Eisentrager*, 339 U.S. 763 (1950), counsels a different result. After denying enemy aliens held abroad the right to sue in U.S. courts, the Supreme Court distinguished the rights of aliens from those of citizens, and opined that "[c]itizenship as a head of jurisdiction and a ground of protection was old when Paul invoked it in his appeal to Caesar. The years have not destroyed nor diminished the importance of citizenship nor have they sapped the vitality of a citizen's claims upon his government for protection." *Id*. at 769. But in the very same paragraph, the Court identified two ways in which the courts protect citizenship: by issuing writs of habeas corpus to those in custody by the United States, and by hearing suits to declare a person a citizen "regardless of whether he is within the United States or abroad." *Id*. at 769-70. But the Court followed by noting that "[w]hen any citizen is deprived of his liberty by any foreign government, it is made the duty of the President to demand the reasons and, if the detention appears wrongful to use means not amounting to acts of war to effectuate his release." *Id.* at 770. The *Eisentrager* Court thus recognized that while citizenship may be a head of jurisdiction, it does not justify jurisdiction when the citizen is not

---

[10]Petitioner repeatedly conflates the authority by which U.S. troops operate within a military theater and the authority under which a prisoner is held. That the United States operates within a multinational military force does not cast all subsequent events in a multinational sheen. Thus courts must look to the substance of the matter and determine the source of authority for the detention.

held by the United States; the only remedies there are diplomatic, not judicial.

Most tellingly, *Eisentrager* recognized the distinction between custody by the authority of the United States and custody by the authority of a multinational entity. As the first matter it considered, the Court found that the petitioners were in the custody of a United States force that derived its authority solely from the United States, and that the "proceeding was conducted wholly under American auspices and involved no international participation." *Id.* at 765. *Eisentrager* thus recognizes the threshold importance of determining the identity of the custodian.

Recent developments in the law of habeas corpus serve to confirm the holding in the instant case. *Rumsfeld v. Padilla*, 542 U.S. 426 (20004), *Rasul v. Bush*, 542 U.S. 466 (2004), *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), and *Hamdan v. Rumsfeld*, 126 S.Ct. 2749 (2006), reiterate that the remedy provided by the writ of habeas corpus is expansive and not confined solely to U.S. citizens. But the one constant in all these cases is that the petitioners were in the custody of the United States alone, in its capacity as the United States, and not by any multinational force. While the prisoners may have been *captured* by a multinational force, they were transferred to the sole custody of the United States, and it was that detention they challenged. There is not even the slightest hint in any of these cases that another nation or multinational entity claimed control over the prisoners.

This is not to say that the United States military may purposefully evade the habeas jurisdiction of the courts, or otherwise deprive citizens of their rights, merely by cloaking its

conduct in the guise of a multinational force.[11]  Nothing in today's holding is inconsistent with

*Abu Ali v. Ashcroft*, 350 F.Supp. 2d 28 (D.D.C. 2004), which held that "the United States may

not avoid the habeas jurisdiction of the federal courts by enlisting a foreign ally as an

intermediary to detain the citizen."  *Id.* at 41.

In *Abu Ali*, an American citizen was arrested and held in the Kingdom of Saudi Arabia by

the Saudi government.  But the citizen alleged, and "to some degree substantiated," that: (1) the

United States initiated his arrest as part of an American criminal investigation; (2) the United

States participated in interrogating him in the Saudi prison; (3) the United States controlled his

---

[11]Military personnel who participate in MNF-I remain subject to the military justice
systems of their respective countries.  United Nations Security Council Resolution 1546 (2004),
which authorized MNF-I, incorporates by reference a letter from Colin Powell, then the Secretary
of State for the United States, in which Powell represents that "the MNF under unified
command" is prepared to participate in the maintenance of security in Iraq.  Opp., Ex. 2 at 11.
Powell's letter states that "the MNF must continue to function under a framework that affords the
force and its personnel the status that they need to accomplish their mission, and in which the
contributing states have responsibility for exercising jurisdiction over their personnel."  *Id.* at 12.
This language indicates that the participants in MNF-I retain court martial jurisdiction over their
own personnel, rather than subjecting them to some sort of joint system of military justice.  The
letter cannot be read to suggest, as petitioner would have it, that the United States courts have
subject matter jurisdiction over the habeas claims of prisoners who are guarded by U.S. forces
operating within the framework of MNF-I.  Taken as a whole and in context, Powell's letter
clearly establishes that MNF-I is a distinct entity created to give the force "the status that they
need to accomplish their mission," and that the letter simply reserves the military justice
jurisdiction of each country "over their personnel."

Furthermore, while placing U.S. personnel under the unified command of a multinational
force may result in the United States courts lacking jurisdiction over habeas corpus petitions by
detainees held by the multinational force on foreign soil, this does not mean that American
military personnel are completely removed from the control of the United States government
when they are put under a multinational command.  To the contrary, they remain under the
direction of the Executive, subject to the oversight of Congress.  *See* U.S. Const. Art. II § 2
(setting forth power of President as commander in chief of the armed forces and in foreign
affairs, subject in appropriate cases to Senate approval); *id*. at Art. I § 8, cl. 11-16 (setting forth
powers of Congress to declare war, "make rules concerning Captures on Land and Water,"
support and fund an army and navy, "make Rules for the Government and Regulation" of the
armed forces, etc.).

detention in the Saudi prison; (4) the United States was keeping him in Saudi Arabia to avoid constitutional scrutiny by American courts; and (5) Saudi Arabia would immediately release the citizen to United States officials upon a request by the United States government. *Id*. at 30-31. The United States did not offer any facts to rebut these allegations, which were substantiated by numerous affidavits and other documentary evidence "of varying degrees of competence and persuasiveness." *Id*. The court held that the citizen was entitled to limited jurisdictional discovery to determine whether he was being held in the actual or constructive custody of the United States. If the citizen could prove that he was being held "at the behest and ongoing direction of United States officials," he could invoke habeas jurisdiction. *Id.* at 67.

The court in *Abu Ali* noted that "[t]he instances where the United States is correctly deemed to be operating through a foreign ally as an intermediary for purposes of habeas jurisdiction will be exceptional, and a federal court's inquiry in such cases will be substantially circumscribed by the separation of powers." *Id.* at 41. Because the United States Executive was acting under its foreign affairs powers in *Abu Ali*, principles of separation of powers and international comity "place[d] considerable limitations on the inquiry (and authority) of a United States court in this setting." *Id*. at 49. The importance of recognizing the "considerable limitations" on a court's "substantially circumscribed" inquiry is especially apparent in this case, where the Executive acts not only under its foreign affairs powers, by dealing with dozens of allies and the United Nations, but also under its war powers.

Applying that "substantially circumscribed" inquiry to this case, it is clear that the United States is not "operating through" MNF-I "as an intermediary." In *Abu Ali* the petitioner presented, and the United States did not attempt to rebut, substantial evidence that the petitioner

19

was arrested and held by officials of the Kingdom of Saudi Arabia at the request of the United States, that America controlled his ultimate disposition, and that his immediate custodians had no independent interest in detaining him. In this case, petitioner offers little real evidence that the United States is using MNF-I as an "intermediary to detain the citizen." The habeas petition alleges that petitioner is "in U.S. custody," and does not allege that the United States is acting through some intermediary. In their briefs, petitioner's counsel merely handpick quotations from U.S. military leaders to imply that the United States has control over MNF-I. *See* Reply Memorandum in Support of Petitioners' Application for a Temporary Restraining Order [10-1] at 5-6 n.2.

Petitioner also submitted supplemental information regarding his hearing and sentencing before the Iraqi Trial Panel. *See generally* Second Riordan Decl. Therein, petitioner apparently attempts to allege that U.S. military personnel interfered with the Iraqi proceeding. This statement, which is disputed by respondents at every point, and which does not point to any evidence that the Americans were acting outside of their roles in MNF-I, falls far short of the kind of allegations that were required in *Abu Ali* to obtain jurisdictional discovery, let alone to establish jurisdiction. To the extent petitioner claims that the Americans interfered with the fairness of his trial, his remedies lie in the Iraqi courts. Petitioner has not alleged the kind of jurisdictional facts that would qualify this case as one of the "exceptional" instances where the United States is acting through an intermediary to detain a citizen.[12] Given the paucity of

---

[12]This puts the Court at odds with the ruling in *Omar v. Harvey*, 416 F.Supp. 2d 19 (D.D.C. Feb. 13, 2006), whereby Judge Urbina issued injunctive relief to bar the transfer of an American citizen from MNF-I to Iraqi authorities. Judge Urbina held that the citizen, Omar, had pled sufficient jurisdictional facts to warrant injunctive relief. The "strong evidence that [Omar] is in the custody of the United States military" consisted of two e-mails from State Department

allegations that petitioner is in the custody of the United States and not MNF-I, and the necessarily "substantially circumscribed" nature of the Court's inquiry, jurisdictional discovery is not warranted.

Finally, *Eisentrager* and *Rasul* strongly suggest that there are constitutional aspects to the right to habeas corpus, whether or not they are embodied in the jurisdictional statute. To the extent that there remain constitutional aspects of the right which have not been covered by recent Supreme Court decisions, this does not change the outcome of this case. The right to habeas corpus embodied in the statute reflects the fundamental nature of the writ as captured in the Constitution and as it has survived for centuries in the common law. It is a right against the sovereign.

Courts have struggled to describe the scope of the right by reference to territorial bounds, citizenship, and the malleable meaning of custody itself. *See, e.g., Rasul*, 542 U.S. 466, nn. 11-14 and accompanying text (collecting authorities on the territorial ambit of the writ at common

---

employees to Omar's wife, saying that he was "under U.S. military care, custody and control" and that he was "under control of Coalition Forces (U.S. and MNF)." *Id.* at 25. The Court respectfully disagrees that the casual representations of a State Department employee provide a sufficient basis for what amounts to piercing the veil between the United States and an entity comprised of the United States acting jointly with its allies. For instance, in this case petitioner Munaf's sister claims that a State Department employee "confirmed that Mohammad [Munaf] was in U.S. custody" in a telephone conversation. Mohammed Decl. ¶ 14. By the logic of *Omar*, this statement would be allowed to trump the determination by the United States and its allies and the United Nations that the allied forces shall act jointly through the distinct entity of MNF-I. The government has been careless in its language, which sometimes reflects the reality that it is mostly U.S. troops who are carrying out the mission of MNF-I, and thus it is usually U.S. troops who are doing the physical "holding" of the petitioner. But it takes more than some offhand remarks by a few government officials to change the nature of a multinational force that has been created by the governments of over two dozen sovereign nations. Much more is required to establish habeas jurisdiction in the face of Supreme Court precedent respecting the distinction between the United States when it acts alone and when it acts as part of an allied force, as well as the "substantially circumscribed" nature of the Court's inquiry under *Abu Ali*.

law); *Ex parte Mwenya*, [1960] 1 Q.B. 241 (same); 1 Op. Atty Gen. 47 (1794) (Attorney General William Bradford opining that the writ extends to areas or entities within the sovereign control of the government). But at least one thing is constant about the right: it applies only against the sovereign that grants it. The petitioner here is challenging his detention on foreign soil, under the authority of a multinational force, at the request of a foreign government. "[P]rovisions of the Federal Constitution relating to the writ of habeas corpus, bills of attainder, ex post facto laws" and the like "have no relation to crimes committed without the jurisdiction of the United States against the laws of a foreign country," because there the citizen is treating with a foreign country, and our Constitution gives him rights only as against the United States. *Neely v. Henkel*, 180 U.S. 109, 122 (1901). The same holds true of a duly constituted allied force, against which petitioner does not have constitutional rights. Whatever independent effect the habeas provision of the Constitution may have, it does not grant petitioner the right to secure the writ against one who does not hold him in custody "under or by color of the authority of the United States" or "in violation of the Constitution or laws or treaties of the United States." The habeas provision of the Constitution therefore cannot expand the jurisdiction of the Court in this case beyond that granted by the statute.

In cases such as *Hirota*, the Supreme Court recognized that when the United States commits troops to a multinational, allied force, that force is a unique juristic entity distinct from the United States. The distinction between unilateral American action and multinational, allied action is no mere nicety or matter of form. It is a real distinction with real, substantive consequences. This distinction was summarized by Justice Jackson, in a separate memorandum, when he described his reluctance to vote for review of the claims in *Hirota*:

22

On American initiative, under direction of the President as Commander-in-Chief, this country invited our Pacific allies, on foreign soil, to cooperate in conducting a grand inquest into the alleged crimes, including the war guilt, of these defendants. Whatever its real legal nature, it bears the outward appearance of an international enterprise, undertaken on our part under the war powers and control of foreign affairs vested in the Executive. For this Court now to call up these cases for judicial review under exclusively American law can only be regarded as a warning to our associates in the trials that no commitment of the President or of the military authorities, even in such matters as these, has finality or validity under our form of government until it has the approval of this Court. And since the Court's approval or disapproval cannot be known until after the event – usually long after – it would substantially handicap our country in asking other nations to rely upon the word or act of the President in affairs which only he is competent to conduct.

*Hirota v. MacArthur*, 335 U.S. 876, 878 (Jackson, J.) (Memorandum).[13]  The United States has

placed troops in Iraq under the unified command of a multinational force.  It has not thereby

placed that force and all its troops, whatever flag they may fly, under the strictures of the

Constitution and the reach of this Court.  There is evidence that this force is a true coalition over

which no single nation has sovereignty, and petitioner has not demonstrated that it is a mere

sham by which the United States seeks to avoid constitutional accountability.  Petitioner is in a

foreign country and in the custody of MNF-I, not the United States, and he is therefore beyond

---

[13]Justice Jackson did not participate in the decision in *Hirota*, because of his involvement in the Nuremberg war crimes tribunal in Europe.  He explained that his decision to break the tie and allow argument in *Hirota* stemmed from a desire to put to rest criticisms of the tribunal by America's enemies, and he did not express an opinion on the Court's jurisdiction.  *Hirota v. MacArthur*, 335 U.S. 876 (1948) (Jackson, J.) (Memorandum).  While petitioner in this case attempts to treat the Court's ruling in *Hirota* as an isolated case, it is worth noting that a divided Supreme Court declined to review numerous habeas petitions implicating dozens of petitioners in Germany following WWII, though four members of the Court wanted to hear argument on the jurisdictional issues raised by the petitions.  Justice Jackson, who recused himself from the cases involving German petitioners, intervened to break the tie and secure review in *Hirota*.  The precedential value of *Hirota* should thus be considered in light of the robust debate that centered around the issues at the time.  *See generally* Charles Fairman, "*Some New Problems of the Constitution Following the Flag*," 1 STAN. L. REV. 587 (1949) (discussing post-WWII habeas petitions by German and Japanese prisoners).

the habeas corpus jurisdiction of this Court.[14]

## III.    CONCLUSION

The Court is aware of the debate over the right of aliens to obtain the writ of habeas corpus, even when they are not held in the United States, and so it is aware that some will consider today's decision anomalous.  But no court in our country's history, other than *Omar*, has ever found habeas corpus jurisdiction over a multinational force comprised of the United States acting jointly with its allies overseas.  And the law is legend that in time of actual hostilities or war, as in Iraq, courts should tread lightly and give the President, as Commander-in-Chief, the full power of his office.  The President has the power to "employ [the Nation's Armed Forces] in the manner he may deem most effectual to harass and conquer and subdue the enemy," *Fleming v. Page*, 50 U.S. (9 How.) 603, 615 (1850), and such decisions are "delicate, complex, and involve large elements of prophecy.  They are and should be undertaken only by those directly responsible to the people whose welfare they advance or imperil.  They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and which has long been held to belong in the domain of political power not subject to judicial intrusion or inquiry."

*Chicago & Southern Air Lines Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948).

---

[14]Petitioner also attempts to invoke jurisdiction under 28 U.S.C. §§ 1331, 1651, 2201, and 2202, Article I, § 9, cl. 2 and Article III of the Constitution, and the Due Process Clause of the Fifth Amendment.  None of these provisions provide a proper basis for jurisdiction.  Because the petitioner is in the custody of MNF-I, against whom no U.S. law secures him rights, he cannot point to a constitutional provision, law, or treaty of the United States that his case arises under, and thus he cannot invoke federal question jurisdiction.  His invocation of the All Writs Act and Declaratory Judgment Act is unavailing because those remedial statutes presume jurisdiction and do not create it.  Likewise, the constitutional provisions he cites do not independently create jurisdiction for him, nor for that matter do they secure any rights for him against his custodian, MNF-I.

"Under a government of law it would not become the courts to set the example of usurpation. They are not in fault for affording no relief, when the power to grant it has been withheld." *In the Matter of Samuel W. Jackson*, 15 Mich. 417, 432 (Mich. 1867).

Because petitioner is in the custody of a multinational entity and not the United States, he cannot invoke this Court's jurisdiction. If at any time it appears that a federal court lacks jurisdiction of the subject matter, "the court shall dismiss the action." Fed. R. Civ. P. 12(h)(3). As such, the Court is compelled to dismiss the petition for habeas corpus with prejudice. This renders petitioner's motions for temporary restraining order moot, and they are accordingly dismissed. A corresponding Order setting forth the Court's Judgment in this case shall issue this date.

Signed by Royce C. Lamberth, United States District Judge, October 19, 2006.